FM PROPERTIES OPERATING COMPANY, et al.,
Appellants,

v.

The CITY OF AUSTIN, Appellee.

No. 98–0685.

Supreme Court of Texas.

Argued Dec. 9, 1998.

Decided June 15, 2000.

Rehearing Overruled Aug. 24, 2000.

Robert D. Thomas, Hohmann & Taube, Eric Taube, Hohmann, Werner & Taube, Austin, P. Michael Jung, Strasburger & Price, Dallas, Roy Q. Minton, John L. Foster, Minton Burton Foster & Collins, Austin, Joe A. Osborn, Kendall Randle Finch & Osborn, Austin, Julian Lockwood, McGinnes Lochridge & Kilgore, Austin, Louis S. Zimmerman, Pike Powers, Mary S. Dietz, Lyn Elizabeth Dean, Marcy H. Greer, Fulbright & Jaworski, Austin, Michael G. Burk, The Burk Law Firm, Austin, John J. McKetta, III, Graves Dougherty Hearon & Moody, Austin, Patton G. Lochridge, Scott Patrick Baker, McGinnis Lochridge & Kilgore, Austin, for Appellants.

Stephen E. McConnico, Jane M. N. Webre, Scott Douglas & McConnico, Austin, Andrew F. Martin, City Atty., Casey L. Dobson, Scott Douglass Luton & McConnico, Austin, Jennifer K. Lipinski, Scott Douglass & McConnico, Austin, Tommy Jacks, Mithoff & Jacks, Austin, Karl Bayer, Law Office of Karl Bayer, Austin, Pamela Stanton Baron, Austin, for appellee.

Justice BAKER delivered the opinion of the Court in which Chief Justice PHILLIPS, Justice ENOCH, Justice Hankinson, Justice O'NEILL and Justice GONZALES joined.

The primary issue in this direct appeal is whether section 26.179 of the Texas Water Code, which allows certain private landowners to create "water quality protection zones" in certain cities' extraterritorial jurisdictions, violates the Texas Constitution. We conclude that it does because it unconstitutionally delegates legislative power to private landowners. Therefore, we affirm the trial court's judgment on the merits as well as on attorney's fees.

## I. BACKGROUND

The Texas Legislature enacted section 26.179 of the Texas Water Code in 1995.[1] *See* TEX. WATER CODE § 26.179. This statute allows landowners of contiguous tracts of at least 500 acres within certain municipalities' extraterritorial jurisdictions (ETJs) to designate their property as "water quality protection zones." *See* TEX. WATER CODE § 26.179(c), (d). The purpose of a water quality protection zone is to "provide the flexibility necessary to facilitate the development of the land within the zone, but which also is intended to result in the protection of the quality of water within the zone." TEX. WATER CODE § 26.179(d). Section 26.179's legislative history clarifies that the statute was intended to relieve large landowners and developers in certain cities' ETJs from "regulatory chaos." *Hearings on S.B. 1017 Before the Senate Comm. on Natural Resources,* 74 th Leg., R.S. (Apr. 4, 1995); *Hearings on H.B. 2471 Before the House Natural Resources Comm.,* 74 th Leg., R.S. (Apr. 10, 1995). Accordingly, the statute exempts the landowners from a variety of otherwise applicable regulations, including water quality regulations, and allows the landowners to create and implement a water quality plan for the zone.

---

1. The Legislature amended relevant parts of section 26.179 in 1999. *See* Act of May 28, 1999, 76 th Leg., R.S., ch. 1543, § 1, 1999 Tex. Gen. Laws 5310, 5310. The amendment only applies to water quality plans or amendments submitted to the Texas Natural Resource Conservation Commission for review and approval on or after June 19, 1999. *See* Act of May 28, 1999, 76 th Leg., R.S., ch. 1543, § 2, 1999 Tex. Gen. Laws 5310, 5312. Therefore, the amendments do not apply to this case. Except as otherwise noted, all citations to section 26.179 are to the 1995 version of section 26.179.

The landowners designate a zone by filing a water quality plan and a general description of water quality protection facilities and proposed land uses for the zone in the applicable county deed records. *See* TEX. WATER CODE § 26.179(e), (f). Landowners owning 500 to 1,000 contiguous acres must secure approval of their water quality protection zones from the Texas Natural Resource Conservation Commission before designating a zone. *See* TEX. WATER CODE § 26.179(d). Landowners owning 1,000 acres or more may designate a zone without pre-approval from the TNRCC. *See* TEX. WATER CODE § 26.179(d). Zones and their corresponding water quality plans are effective immediately upon recordation in the applicable county deed records. *See* TEX. WATER CODE § 26.179(f), (g). A zone's water quality plan is a covenant running with the land. *See* TEX. WATER CODE § 26.179(h).

Section 26.179 allows landowners to choose between two general objectives in formulating their water quality plans: (1) to maintain background levels of water quality in waterways; or (2) to capture and retain the first 1.5 inches of rainfall from developed areas. *See* TEX. WATER CODE § 26.179(a). For each zone, a registered professional engineer must certify that the water quality plan is designed to achieve one of these objectives. *See* TEX. WATER CODE § 26.179(g). For zones purporting to maintain background levels of water quality, the landowners determine the water quality levels to be maintained by setting up monitoring sites within the zone and collecting water quality data from the sites. *See* TEX. WATER CODE § 26.179(b). If such data are unavailable, the landowners must hire a professional engineer to calculate background levels using methods the statute specifies. *See* TEX. WATER CODE § 26.179(b).

The TNRCC reviews water quality plans, but it must approve a plan unless the TNRCC finds that implementing the plan will not reasonably attain one of the two water quality objectives. *See* TEX.

WATER CODE § 26.179(g). Zones are presumed to satisfy all other state and local requirements for water quality protection. *See* TEX. WATER CODE § 26.179(k). But development in the zone must comply with all state laws and commission rules regulating water quality which are in effect on the date the landowner designates the zone. *See* TEX. WATER CODE § 26.179(k)(1). In addition to section 26.179's two water quality objectives, the TNRCC may require and enforce water quality protection measures to comply with mandatory federal water quality requirements. *See* TEX. WATER CODE § 26.179(m).

Landowners may amend a plan from time to time. *See* TEX. WATER CODE § 26.179(g). The TNRCC may deny such amendments only if the TNRCC finds that the amended plan will impair the attainment of section 26.179(a)(1) or (a)(2)'s requirements. *See* TEX. WATER CODE § 26.179(g).

In reviewing the water quality plan, the TNRCC may not require public hearings and must complete its review and approval of a plan or amendment within 120 days after receiving the plan. *See* TEX. WATER CODE § 26.179(g). Landowners may appeal a TNRCC denial of a plan or amendment in a court of competent jurisdiction. *See* TEX. WATER CODE § 26.179(g). On appeal, the TNRCC has the burden of proof. *See* TEX. WATER CODE § 26.179(g). For zones of 1,000 acres or more, a plan or amendment remains effective during an appeal of a TNRCC denial. *See* TEX. WATER CODE § 26.179(g).

The statute requires landowners that choose to maintain water quality background levels to monitor water quality for three years after each phase of development is complete and to submit annual technical reports to the TNRCC for the same three years. *See* TEX. WATER CODE § 26.179(b). If the reports show that the landowner did not maintain background levels the previous year, the landowner must modify the water quality plans for future phases of development in the zone

and operational and maintenance practices in existing phases of the zone "to the extent reasonably feasible and practical." TEX. WATER CODE § 26.179(b)(1), (2). For plans purporting to retain 1.5 inches of rainfall, water quality monitoring is not required. *See* TEX. WATER CODE § 26.179(b).

Once a zone is designated, a municipality may not enforce in the zone any "ordinances, land use ordinances, rules, or requirements including, but not limited to, the abatement of nuisances, pollution control and abatement programs or regulations, water quality ordinances, subdivision requirements, other than technical review and inspections for utilities connecting to a municipally owned water or wastewater system, or any environmental regulations" that are inconsistent with or impair the ability to implement and operate the land use plan and water quality plan as filed. TEX. WATER CODE § 26.179(i).

In addition, a city may not collect fees or assessments or exercise powers of eminent domain within a zone until it annexes the zone. *See* TEX. WATER CODE § 26.179(i). And, a city cannot annex a zone until ninety percent of the zone's facilities and infrastructure described in the water quality plan as being necessary to carry out the plan are completed, or until twenty years from the designation date has passed, whichever occurs first. *See* TEX. WATER CODE § 26.179(i).

After the Legislature enacted section 26.179, several landowners designated zones in the City of Austin's ETJ. Zones were not designated in any other municipality's ETJ. The City sued several of the landowners who had designated zones in the City's ETJ, seeking a declaration that section 26.179 is unconstitutional. The City alleged that section 26.179 violates various provisions of the Texas Constitution because it: (1) unconstitutionally delegates legislative power to private landowners in violation of article II, section 1 and article III, section 1; (2) is an unconstitutional local and special law targeting the

City of Austin in violation of article III, section 56; (3) unconstitutionally infringes on municipal home rule powers conferred to the City by article XI, section 5; (4) retroactively impairs the City's vested property rights in violation of article I, section 16; and (5) allows private landowners to suspend laws in violation of article I, section 28. The Landowners counterclaimed for a declaration that section 26.179 is constitutional and sought attorney's fees. The State of Texas intervened to defend the statute's constitutionality. The City and the defendants filed cross-motions for summary judgment. The trial court rendered a final judgment declaring section 26.179 unconstitutional, without specifying the grounds for its judgment, and permanently enjoined the Landowners from designating new zones or adding land to existing zones. The trial court also denied the Landowners' attorney's fees claims. The Landowners brought this direct appeal asserting that section 26.179 is constitutional and that they are entitled to attorney's fees.

## II. APPLICABLE LAW

### A. STANDARD OF REVIEW—CROSS-MOTIONS FOR SUMMARY JUDGMENT

When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence and determine all questions presented. *See Commissioners Court of Titus County v. Agan*, 940 S.W.2d 77, 81 (Tex.1997); *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988). The reviewing court should render the judgment that the trial court should have rendered. *See Agan*, 940 S.W.2d at 81; *Members Mut. Ins. Co. v. Hermann Hosp.*, 664 S.W.2d 325, 328 (Tex.1984). When a trial court's order granting summary judgment does not specify the grounds relied upon, the reviewing court must affirm summary judgment if any of the summary judgment grounds are meri-

torious. *See Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex.1995).

## B. Statutory Construction

 If possible, we interpret a statute in a manner that renders it constitutional. *See Quick v. City of Austin,* 7 S.W.3d 109, 115 (Tex.1999); *Proctor v. Andrews,* 972 S.W.2d 729, 735 (Tex.1998). In a facial challenge to a statute's constitutionality, we consider the statute as written, rather than as it operates in practice. *See Proctor,* 972 S.W.2d at 735–36, *Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 623 (Tex. 1996). But we may also consider legislative history and reasonable constructions of the statute by the agency charged with implementing it. *See* Tex. Gov't Code § 311.023(3), (6); *State v. Public Util. Comm'n,* 883 S.W.2d 190, 196 (Tex.1994).

## C. Delegation of Legislative Power

The Texas Constitution vests "legislative power" in the Legislature. *See* Tex. Const. art. III, § 1. Defining what legislative power is or when it has been delegated is no easy task. *See, e.g.,* Barber, The Constitution and Delegation of Congressional Power 38 (1975); Jaffe, *Law Making by Private Groups,* 51 Harv. L.Rev. 201, 248 (1937). Generally, commentators have defined legislative power as the power to make rules and determine public policy. *See* Barber, *supra,* at 38 (defining legislative power as "deciding between conflicting proposals presented by clashing interests"); Schoenbrod, Power Without Responsibility: How Congress Abuses the People Through Delegation 181 (1993) ("The essence of . . . legislative power is the making of laws of private conduct."). In Texas, legislative power is defined broadly. It includes the power to set public policy. *See, e.g., Chemical Bank & Trust Co. v. Falkner,* 369 S.W.2d 427, 432 (Tex.1963); *Davis v. City of Lubbock,* 160 Tex. 38, 326 S.W.2d 699, 713 (1959). In addition, it includes many functions that have administrative aspects, including the power to provide the details of the law, to promulgate rules and regulations to apply the law, and to ascertain conditions upon which existing laws may operate. *See Texas Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454, 466–67 (Tex.1997); *see also Housing Auth. of Dallas v. Higginbotham,* 135 Tex. 158, 143 S.W.2d 79, 87 (1940) (providing categories of delegations to public entities, including delegations to make rules to implement statutes, to find facts and ascertain conditions upon which an existing law may operate, to fix rates, and to determine the question of necessity of taking land for public use). Because this definition of delegation sweeps so broadly, it is not surprising that "the debate over unconstitutional delegation becomes a debate not over a point of principle but over a question of degree." *Boll Weevil,* 952 S.W.2d at 466 (quoting *Mistretta v. United States,* 488 U.S. 361, 415, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (Scalia, J., dissenting)).

 Although the Constitution vests legislative power in the Legislature, courts have recognized that in a complex society like ours, delegation of legislative power is both necessary and proper in certain circumstances. *See Boll Weevil,* 952 S.W.2d at 466. Thus, the Legislature may delegate legislative power to local governments, administrative agencies, and even private entities under certain conditions. *See Proctor,* 972 S.W.2d at 734–35. The Legislature may delegate powers to agencies established to carry out legislative purposes as long as the Legislature establishes reasonable standards to guide the agency in exercising those powers. *See Boll Weevil,* 952 S.W.2d at 467; *see also Edgewood Indep. Sch. Dist. v. Meno,* 917 S.W.2d 717, 740 (Tex.1995) (upholding a delegation to the Commissioner of Education to adopt rules "necessary for the implementation of" Chapter 36 of the Education Code); *Higginbotham,* 143 S.W.2d at 81, 83, 86 (upholding a statute giving a housing authority the power to, among

other things, condemn property and to select housing for tenants).

But because delegations to private entities raise more troubling constitutional issues than public delegations, they are subject to more stringent requirements and less judicial deference than public delegations. *See Proctor,* 972 S.W.2d at 735; *Boll Weevil,* 952 S.W.2d at 469–70. Legislative delegations to private entities can compromise "the basic concept of democratic rule under a republican form of government" because private delegates are not elected by the people, appointed by a public official or entity, or employed by the government. *Boll Weevil,* 952 S.W.2d at 469. And, on a more practical basis, private delegations may allow private interests to adversely affect the public interest. *See Boll Weevil,* 952 S.W.2d at 469.

Nevertheless, as we explained in *Boll Weevil,* private delegations are frequently necessary and desirable. *See Boll Weevil,* 952 S.W.2d at 469. Indeed, private delegations are used extensively in Texas government. The Legislature has routinely delegated to private associations the power to promulgate certain industrial and professional standards. *See, e.g.,* Tex. Gov't Code § 441.007(b) (requiring graduation from a privately accredited library school for permanent certification as county librarian); Tex. Health & Safety Code § 142.006 (allowing the Department of Health to issue licenses to privately accredited homes and community support services agencies); Tex. Occ.Code § 204.153 (defining physician assistant as person who graduated from a program accredited by the American Medical Association's Committee on Allied Health Education and Accreditation and who has passed the certifying examination administered by the National Commission on Certification of Physician Assistants); *see also Proctor,* 972 S.W.2d at 738 (upholding a delegation to two private entities, the American Arbitration Association and the Federal Mediation and Conciliation Service, to decide whether a hearing examiner was "a qualified neutral arbitrator" to hear civil service appeals); *Dudding v. Automatic Gas Co.,* 145 Tex. 1, 193 S.W.2d 517, 519 (1946) (upholding adoption of standards recommended by National Fire Protection Association and National Board of Fire Underwriters regarding liquified petroleum gas); *Office of Pub. Ins. Counsel v. Texas Auto. Ins. Plan,* 860 S.W.2d 231, 238 (Tex.App.—Austin 1993, writ denied) (upholding delegation to a private association to make rules for the state's plan for providing motor vehicle liability insurance to high risk drivers).

■ But as we further explained in *Boll Weevil,* once we determine that there has been a private delegation, we must then determine whether it is constitutional by analyzing it under eight factors:

1. Are the private delegate's actions subject to meaningful review by a state agency or other branch of state government?

2. Are the persons affected by the private delegate's actions adequately represented in the decisionmaking process?

3. Is the private delegate's power limited to making rules, or does the delegate also apply the law to particular individuals?

4. Does the private delegate have a pecuniary or other personal interest that may conflict with its public function?

5. Is the private delegate empowered to define criminal acts or impose criminal sanctions?

6. Is the delegation narrow in duration, extent, and subject matter?

7. Does the private delegate possess special qualifications or training for the task delegated to it?

8. Has the Legislature provided sufficient standards to guide the private delegate in its work?

*See Proctor,* 972 S.W.2d at 735; *Boll Weevil,* 952 S.W.2d at 472.

If a particular statute delegates legislative authority to a private entity and these eight factors weigh against the delegation, then the statute is unconstitutional. *See Boll Weevil*, 952 S.W.2d at 475. *Boll Weevil* does not specify if any factors weigh more heavily than others, but the importance of each factor will necessarily differ in each case. For example, *Boll Weevil's* constitutional analysis properly focused heavily on the first factor—whether there was meaningful governmental review of the delegates' actions. *See Boll Weevil*, 952 S.W.2d at 473–74. Because one of the central concerns in private delegations is the potential compromise of our "democratic rule under a republican form of government," weighing the first factor heavily is appropriate whenever a statute delegates legislative power to private interested parties. *Boll Weevil*, 952 S.W.2d at 469. Because the other central concern is the potential that the delegate may have a "personal or pecuniary interest inconsistent with or repugnant to the public interest to be served," another factor that weighs heavily in these kinds of delegations is, of course, the fourth factor—whether the private delegate has a pecuniary or other personal interest that may conflict with its public function. *Boll Weevil*, 952 S.W.2d at 469.

### III. ANALYSIS

#### A. SECTION 26.179 DELEGATES LEGISLATIVE POWER TO PRIVATE LANDOWNERS

■ The City asserts that Section 26.179 delegates legislative power to private landowners. We agree.

Section 26.179 delegates to certain private landowners the power to regulate water quality on their property and in waterways located on their property. *See* TEX. WATER CODE § 26.179(d); 21 Tex. Reg. 11597 (1996). Section 26.179 allows landowners to choose between two general objectives in formulating their water quality plans: (1) to maintain background levels of water quality in waterways; or (2) to capture and retain the first 1.5 inches of rainfall from developed areas. *See* TEX. WATER CODE § 26.179(a). But landowners owning 1,000 acres or more, at least initially, decide how to achieve these objectives in their water quality plans. While landowners owning 500 to 1,000 acres must secure pre-approval of their water quality zones from the TNRCC, landowners owning 1,000 acres or more can designate a zone and implement a water quality plan without pre-approval from the TNRCC. *See* TEX. WATER CODE § 26.179(e), (f). Only after these plans are in effect does the TNRCC have review power. *See* TEX. WATER CODE § 26.179(g). And if the TNRCC denies a plan and the landowner appeals that decision in court, the plan remains in effect throughout the appeal process. *See* TEX. WATER CODE § 26.179(g). Further, for zones of all sizes, the TNRCC has the burden of proof on the denial of a plan or amendment to a plan. *See* TEX. WATER CODE § 26.179(g).

Section 26.179 also delegates to certain landowners the power to exempt themselves from the enforcement of municipal regulations. It authorizes landowners who designate a zone to exempt their property from the enforcement of those municipal ordinances, rules, or requirements which "are inconsistent with the land use plan and the water quality plan or which in any way limit, modify, or impair the ability to implement and operate the water quality plan and the land use plan within the zone as filed." TEX. WATER CODE § 26.179(i). The municipal ordinances affected are not limited to those regulating water quality. They include land use ordinances, nuisance abatement, platting and subdivision requirements, pollution control and abatement programs or regulations, and "any environmental regulations." TEX. WATER CODE § 26.179(i).

■ The powers delegated to the landowners are legislative powers. Water quality regulation is a legislative power. *See Barshop*, 925 S.W.2d at 634. The conservation, preservation, and develop-

ment of the State's natural resources are public rights and duties, and the Legislature is charged with passing laws to protect these public rights. *See* TEX. CONST. art. XVI, § 59 (stating that the conservation and preservation of Texas' natural resources are "public rights and duties"); *Sipriano v. Great Spring Waters of Am., Inc.,* 1 S.W.3d 75, 81 (Tex.1999) (Hecht, J., concurring) ("The people of Texas have given the Legislature ... not only the power but the duty to 'pass all such laws as may be appropriate' for the conservation, development, and preservation of the State's natural resources."); *Barshop,* 925 S.W.2d at 623 ("[T]he State has the responsibility under the Texas Constitution to preserve and conserve water resources for the benefit of all Texans."); *Maple Run at Austin Mun. Util. Dist. v. Monaghan,* 931 S.W.2d 941, 947 (Tex.1996) ("[A]ll Texans have an interest in protecting this State's natural resources").

The Legislature has generally delegated state water quality regulation to the TNRCC. *See* TEX. WATER CODE §§ 5.012; 26.011, 26.0136, 26.023, 26.036, 26.127. In addition, it has given cities the power to regulate water quality within their city limits and extraterritorial jurisdictions. *See* TEX. WATER CODE § 26.177; TEX. LOC. GOV'T CODE § 401.002. The Legislature has also empowered conservation and reclamation districts to regulate water quality. *See, e.g.,* TEX. WATER CODE §§ 36.001–.374 (groundwater districts) and §§ 51.001–.875 (water control and improvement districts).

Here, the Legislature has provided general water quality objectives in section 26.179, but has empowered private landowners to fill in the details—to decide whether and how to apply section 26.179 to their property, to make rules to implement section 26.179, and to ascertain conditions upon which the statute may operate. These are legislative powers. *See Boll Weevil,* 952 S.W.2d at 466–67; *see also Higginbotham,* 143 S.W.2d at 87.

The landowners' power to exempt themselves from the enforcement of mu-

nicipal regulations is also a legislative power. By allowing landowners to decide which municipal regulations are enforceable on their property, section 26.179 allows private landowners to ascertain the conditions upon which existing municipal laws will operate. *See* TEX. WATER CODE § 26.179(i). As a general premise, municipalities enact water quality and other regulations to further the public interest. *See* TEX. WATER CODE § 26.177(b) (providing that, subject to section 26.179, water pollution control and abatement programs may include areas within a city's ETJ which in the city's judgment should be included to achieve the city's water quality objectives); TEX. LOC. GOV'T CODE § 212.002 (stating that the purpose of subdivision regulations is "to promote the health, safety, morals, or general welfare of the municipality and the safe, orderly, and healthful development of the municipality"); *City of Round Rock v. Smith,* 687 S.W.2d 300, 302 (Tex. 1985) (stating that platting regulation promotes orderly development of the community and safe subdivision construction); *Lacy v. Hoff,* 633 S.W.2d 605, 609 (Tex. App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.) (stating that subdivision regulation ensures, among other things, adequate streets and alleys, police and fire protection, and sanitary conditions); *LJD Properties, Inc. v. City of Greenville,* 753 S.W.2d 204, 207 (Tex.App.—Dallas 1988, writ denied) (stating that municipalities prescribe and abate public nuisances to protect the health, safety, comfort or welfare of the public). In fact, such regulations must be substantially related to the public health, safety, or welfare to be valid. *See City of College Station v. Turtle Rock Corp.,* 680 S.W.2d 802, 805 (Tex.1984); *see also FM Properties Operating Co. v. City of Austin,* 93 F.3d 167, 174 (5th Cir.1996); *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 933–34 (Tex.1998); *LJD Properties, Inc.,* 753 S.W.2d at 207.

Therefore, section 26.179 delegates legislative power to private landowners because it gives them legislative duties and

powers, the exercise of which may adversely affect public interests, including the constitutionally-protected public interest in water quality.

Consistent with our holding, a number of courts have held that laws authorizing private property owners to veto or exempt themselves from otherwise applicable regulations or to regulate their own property are delegations of legislative power. *See County of Fairfax v. Fleet Indus. Park L.P.*, 242 Va. 426, 410 S.E.2d 669, 673 (1991); *Brodner v. City of Elgin*, 96 Ill. App.3d 224, 51 Ill.Dec. 618, 420 N.E.2d 1176, 1178 (1981); *Bayside Timber Co. v. Board of Supervisors*, 20 Cal.App.3d 1, 97 Cal.Rptr. 431, 436–38 (1971); *see also Stewart v. Utah Pub. Serv. Comm'n*, 885 P.2d 759, 775–77, 779 (Utah 1994) (holding that a statute allowing a privately-owned utility to veto an incentive rate regulation plan adopted by a public commission unconstitutionally delegated legislative power to a private party); *Revne v. Trade Comm'n*, 113 Utah 155, 192 P.2d 563, 568 (1948)(holding that a statute allowing a group representing seventy percent of the barbers in a city to initiate a price schedule to submit to the State Barber Board for approval was an unconstitutional delegation).

In *County of Fairfax*, the Virginia Supreme Court held that a state law that required county supervisors to get unanimous consent from all affected landowners before enacting certain zoning regulations was an unconstitutional delegation of legislative power. *See County of Fairfax*, 410 S.E.2d at 670. The court noted that the county was powerless to enact zoning regulations even if it reasonably determined that the regulations were necessary for the public welfare. *See County of Fairfax*, 410 S.E.2d at 673. Similarly, in *Brodner*, the court held that a city ordinance that required an owner's consent before a city could rezone his property was an unconstitutional delegation of legislative power. *See Brodner*, 51 Ill.Dec. 618, 420 N.E.2d at 1178. The court noted that, although the city may be effecting a comprehensive zoning plan in pursuit of the common good, the owner had the absolute discretion to decide that no rezoning shall ever occur and could selfishly and arbitrarily frustrate the City's plan. *See Brodner*, 51 Ill.Dec. 618, 420 N.E.2d at 1178. And, in *Bayside Timber*, the court held that a state law allowing timber owners and operators to promulgate industry rules was an unconstitutional delegation. *See Bayside Timber*, 97 Cal.Rptr. at 436–37. The court noted the industry's detrimental effects on the environment, the public interest in the environment, and the lack of standards or safeguards in the statute to protect the public interest. *See Bayside Timber*, 97 Cal.Rptr. at 434–37.

Finally, we note that the delegation here presents the very concerns this Court identified in *Boll Weevil*. *See Boll Weevil*, 952 S.W.2d at 469. In developing and implementing a water quality plan, the landowners are exercising authority over water quality, a public interest. In exempting themselves from the enforcement of their choice of municipal regulations, they may affect the public interest on whose behalf those regulations were enacted. Yet, the landowners are not elected by the people, appointed by a public official or entity, or employed by the government. And, their pecuniary interest in developing their land to realize profit may be inconsistent with or repugnant to the public interest. Accordingly, we conclude that section 26.179 delegates legislative power to private landowners.

## B. THE DISSENTING OPINIONS

■ Most of Justice Owen's dissent is nothing more than inflammatory rhetoric, and thus merits no response. We note only that the two legal arguments Justice Owen does make are both based on a flawed premise. First, she argues that section 26.179 is not a delegation because, in enacting the statute, the Legislature merely took back the regulatory power that the Legislature itself gave to munici-

palities. Second, she argues that section 26.179 cannot be a delegation because it merely restores private property rights to landowners. But section 26.179 does not just deregulate. Instead, as we have explained, the statute gives private landowners public duties and regulatory power to achieve those duties. Just because the Legislature could have deregulated property in ETJs or regulated property in ETJs itself does not mean that giving these duties and powers to the landowners cannot be a delegation. On the contrary, *this is the definition of a legislative delegation.* Again, legislative power includes the power to provide the details of the law, to promulgate rules and regulations to apply the law, and to ascertain conditions upon which existing laws may operate. *See Boll Weevil,* 952 S.W.2d at 466–67; *Higginbotham,* 143 S.W.2d at 87. When the Legislature gave these powers to the landowners with the obligation to protect water quality, it delegated legislative power to them. To the extent that Justice Owen's dissent makes additional legal arguments, these arguments mirror Justice Abbott's and we consider them in our response to Justice Abbott's dissent. Interestingly, part I of Justice Abbott's dissent relies heavily on the dissent he joined in *Boll Weevil. See Boll Weevil,* 952 S.W.2d at 491 (Cornyn, J., concurring and dissenting). First, Justice Abbott claims that the sky is falling because of our holding that section 26.179 is unconstitutional. 22 S.W.3d at 898–99; *see Boll Weevil,* 952 S.W.2d at 491–92 (Cornyn, J., concurring and dissenting). But this case is not about school vouchers, private prisons, or even private property rights. *Cf. Boll Weevil,* 952 S.W.2d at 473 ("[W]e express no opinion as to whether any of the other statutory enactments cited by the dissenting justices would or would not pass constitutional muster. Thus, in no way does our opinion, as the dissenting justices fear, 'ultimately threaten the heretofore established role of quasi-governmental entities under Texas law.' "). The issue in this case is whether section 26.179 of the Water Code is a constitutional delegation.

Next, as the dissent in *Boll Weevil* argued, Justice Abbott argues that we have improperly applied the standard of review for facial challenges. 22 S.W.3d at 900; *Boll Weevil,* 952 S.W.2d at 492 (Cornyn, J., concurring and dissenting). Again, we reject this argument here for the same reasons we rejected it in *Boll Weevil.* Because we are reviewing the statute under a facial challenge, section 26.179's constitutionality depends on whether the statute as written, rather than as it operates in practice, passes the *Boll Weevil* factors. *See Proctor,* 972 S.W.2d at 735; *Boll Weevil,* 952 S.W.2d at 472–74. Further, our analysis of the statute's constitutionality does not rely on individual outcomes or individual steps in the governmental review process, but on the statutory scheme as a whole. *See Boll Weevil,* 952 S.W.2d at 473. Thus, the fact that the TNRCC actually denied two water quality plans does not render the statute constitutional. Because the overall statutory scheme is itself unconstitutional, the statute always operates unconstitutionally, regardless of whether the TNRCC approves or denies a particular plan. Indeed, as we explain in our discussion of the *Boll Weevil* factors, despite the TNRCC's power to deny water quality plans, there is no meaningful governmental review of the landowners' actions, there is inadequate representation of those affected by the landowners' actions, the landowners have pecuniary interests that may conflict with their public function, and the delegation is broad in duration and extent. In sum, that the application of an unconstitutional statute can, in some cases, reach the same result as the application of a constitutional statute does not make the unconstitutional statute constitutional.

Before we consider the constitutionality of the delegation in depth, we respond to Justice Abbott's claim that there is no delegation at all. First, Justice Abbott argues that section 26.179 does not dele-

gate legislative power because it merely allows landowners to opt out of municipal regulations and into section 26.179's water quality protection scheme. On the contrary, section 26.179 does more than that. Section 26.179 does not simply allow landowners to choose between two distinct regulatory schemes. Unlike the statutes in the cases the dissent cites, section 26.179 allows the landowners to *create* part of the regulatory scheme that they choose. *See* TEX. WATER CODE § 26.179(g); *cf. Helvering v. Lerner Stores Corp.*, 314 U.S. 463, 468, 62 S.Ct. 341, 86 L.Ed. 482 (1941) (statute allowing taxpayers to choose between distinct and predefined tax bases); *Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526, 531, 37 S.Ct. 190, 61 L.Ed. 472 (1917) (statute allowing adjoining landowners to waive a zoning prohibition against billboards on their neighbor's property).

The landowners create a water quality and land use plan, thereby exempting themselves from the enforcement of municipal regulations that are inconsistent with or inconvenient to those plans, and thus cannot be enforced on their property. *See* TEX. WATER CODE § 26.179(i). Therefore, although the landowners are not given the power to directly suspend municipal laws, the landowners do ascertain conditions upon which those laws will be enforced. Again, this is a legislative power. *See Higginbotham*, 143 S.W.2d at 87. Justice Abbott argues that the Legislature could not have practically specified which municipal powers would be inconsistent with water quality or land use plans. This may be true. But he misses the point. The landowners have the power to create those inconsistencies simply by drawing up plans that do not comply with municipal regulations. For the same reason, Justice Abbott's argument that there is no delegation because the courts will ultimately decide disputes about whether a particular municipal regulation can be enforced in a zone is equally misguided. The only issue a court could review in such a dispute is whether the regulation at issue is in fact inconsistent with the landowner's plans

and therefore cannot be enforced. Further, that a court can ultimately decide disputes about the exercise of a delegated power cannot mean, as the dissent argues, that there is no delegation. Courts routinely review delegates' decisions. *See, e.g., Quick*, 7 S.W.3d at 119 (holding that a city ordinance was not invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality); TEX. GOV'T CODE § 2001.171 (providing judicial review of state agency decisions).

Justice Abbott also argues that, unlike the delegation in *Boll Weevil*, the landowners do not have authoritative power over the private property of others. *Cf. Boll Weevil*, 952 S.W.2d at 471. We agree. But we disagree that this means that there is no delegation of legislative power here. In *Boll Weevil*, the statute at issue provided for the creation of a private foundation that, subject to referendum approval from affected cotton growers, operated boll weevil eradication programs and assessed cotton growers for the programs' costs. *See Boll Weevil*, 952 S.W.2d at 456–57. The foundation could impose penalties upon growers for the late payment of assessments and could enter private property without the owner's permission for any purpose under the statute, including the monitoring, treatment and destruction of crops. *See Boll Weevil*, 952 S.W.2d at 457–58.

Here, the landowners regulate water quality and decide which municipal regulations are enforceable only on their own property and the property of their successors in interests. *See* TEX. WATER CODE § 26.179(d), (h). Nevertheless, the landowners' powers over water quality protection and their power to exempt themselves from the enforcement of municipal ordinances could adversely affect the public interest, and more specifically, the interests of downstream water users and the landowners' neighbors. Therefore, the landowners, like the foundation in *Boll Weevil*, are charged with legislative duties

and powers, the exercise of which could affect the public interest and specific third parties.

■ Next, Justice Abbott contends that classifying section 26.179 as a delegation renders every statute that allows private citizens discretion in meeting a statutory standard a delegation. We disagree. A delegation occurs only when an entity is given a public duty and the discretion to set public policy, promulgate rules to achieve that policy, or ascertain conditions upon which existing laws will apply. *See Boll Weevil,* 952 S.W.2d at 466–67; *Higginbotham,* 143 S.W.2d at 87. By entrusting private landowners with authority over water quality protection and other regulations on their property, section 26.179 entrusts them with public duties and gives them broad discretion to decide whether, how, and to what extent to achieve those duties.

The remainder of the Justice Abbott's argument about why section 26.179 is not a delegation relies heavily on the TNRCC's role in reviewing water quality plans and in regulating water quality in general and implies that because section 26.179 delegates power to the TNRCC, it does not delegate power to the landowners. But, as we explained in *Boll Weevil,* when a statute delegates authoritative power to private interested parties, it is a private delegation. *See Boll Weevil,* 952 S.W.2d at 471. That the delegation is in conjunction with a delegation to a public entity, or that the government reviews the delegate's actions may be relevant in assessing the *constitutionality of the delegation,* but it does not mean that it is not a private delegation. *See Boll Weevil,* 952 S.W.2d at 471.

## C. SECTION 26.179'S DELEGATION IS UNCONSTITUTIONAL

Because section 26.179 delegates legislative power to private landowners, we determine its constitutionality by applying *Boll Weevil's* eight-factor test. We conclude that section 26.179 is an unconstitu-tional delegation of legislative powers to private landowners.

### 1. Governmental Review

This first factor weighs heavily against the delegation. This is significant because, as we have said, this factor is relatively important in analyzing delegations to private interested parties.

Section 26.179 vests the TNRCC with only limited review over the landowners' water quality protection plans and their effectiveness in protecting water quality. Further, neither the TNRCC nor any other governmental agency has the power to review the landowners' decisions about which municipal regulations will be enforceable on their property.

First, we agree with the Landowners and the dissent that under section 26.179, landowners remain subject to pre-existing state water quality regulations, future state water quality regulations necessary to comply with federal standards, and the TNRCC's powers to enforce those regulations. Zones implementing water quality plans that meet section 26.179's requirements are presumed to satisfy all other state and local requirements for water quality protection. *See* TEX. WATER CODE § 26.179(k). Nevertheless, section 26.179 requires that development in the zones comply with all state laws and TNRCC rules regulating water quality which are in effect on the zone designation date. *See* TEX. WATER CODE § 26.179(k)(1). These may include existing permitting, licensing, and spill response programs designed to prevent pollution from storage, transportation, and disposal of waste, hazardous substances, and wastewater. *See* 21 Tex. Reg. 11601 (1996). Specifically, TNRCC regulations related to the Edwards Aquifer, onsite wastewater treatment, water well drilling, sewerage systems, underground and aboveground storage tanks, effluent limitations, and watershed protection may apply to the zones. *See* 21 Tex. Reg. 11601–02 (1996). Further, subsection

26.179(m) provides that the TNRCC may require and enforce additional water quality protection measures to comply with mandatory federal water quality requirements. *See* TEX. WATER CODE § 26.179(m).

But section 26.179 curbs the TNRCC's review and enforcement powers over section 26.179's requirements and the landowners' discretion in meeting them in several important ways. Section 26.179 requires the TNRCC to review water quality plans and their effectiveness in achieving section 26.179's objectives of maintaining background levels of water quality or retaining 1.5 inches of rainfall. Landowners owning 500 to 1,000 acres must secure pre-approval of their zone designations from the TNRCC before their zone designations are recorded in the county deed records and become effective. *See* TEX. WATER CODE § 26.179(d). Zone designations include a water quality plan for the zone, a description of proposed water quality facilities and infrastructure, and a general description of proposed land uses for the zone. *See* TEX. WATER CODE § 26.179(e). Although the statute is not explicit about the scope of the TNRCC's review, the TNRCC has reasonably interpreted the pre-approval provision to require that the TNRCC approve water quality plans and amendments before they become effective in zones of 500 to 1,000 acres. *See* TEX. WATER CODE § 26.179(d), (e), (g); *see also* 30 TEX. ADMIN. CODE § 216.3(a). Therefore, the TNRCC cannot disapprove a zone designation for any other reason other than the failure of the zone's water quality plan to meet section 26.179's requirements.

Landowners with 1,000 acres or more need not seek TNRCC approval until after their water quality plans or amendments are already in effect. *See* TEX. WATER CODE § 26.179(g). Section 26.179(g) provides that, for these larger zones, water quality plans need not be submitted to the TNRCC until after they are recorded in county deed records. *See* TEX. WATER

CODE § 26.179(g). Subsection (g) further provides that water quality plans and amendments to plans are effective immediately upon recordation and apply during TNRCC review and even during an appeal of a TNRCC denial of the plan or amendment. *See* TEX. WATER CODE § 26.179(g). Thus, landowners owning 1,000 acres or more can begin to develop land and implement water quality plans even before the TNRCC begins its review. *See* 21 Tex. Reg. 11607 (1996) ("[C]onstruction is allowed by provisions of the statute ... upon proper designation of the zone and submittal of the water quality plan for the zone to the executive director for review.").

This is contrary to the rule in similar regulatory schemes. *See* TEX. WATER CODE § 26.027(c) ("A person may not commence construction of a [water] treatment facility until the commission has issued a permit."); TEX. WATER CODE § 11.121 ("Except as provided in ... this code, no person may ... begin construction of any work designed for the storage, taking, or diversion of water without first obtaining a permit from the commission."); 30 TEX. ADMIN. CODE § 213.2 ("[T]he owner of an existing or proposed site, such as a residential or commercial development, ... who proposes new or additional regulated activities under this chapter, must file for and receive [TNRCC] executive director approval of all appropriate applications prior to commencement of construction of new or additional regulated activities"); 30 TEX. ADMIN. CODE § 213.4(a)(1) ("No person may commence the construction of any regulated activity until an Edwards Aquifer protection plan or modifications to the plan ... has been reviewed and approved by the [TNRCC] executive director.").

The TNRCC must approve a plan or amendment to a plan unless the TNRCC finds that implementing it will not reasonably maintain background levels of water quality or capture and retain the first 1.5 inches of rainfall. *See* TEX. WATER CODE § 26.179(g). The statute is silent about the effect of a TNRCC denial of a plan or

amendment. The TNRCC, however, has reasonably interpreted the statute to provide that a denied water quality plan is no longer effective unless the landowner appeals the denial. *See* 30 TEX. ADMIN. CODE §§ 216.3(e)(6), 216.4(1). The statute allows a landowner to appeal the TNRCC's denial of a plan or amendment to the courts, and, contrary to the general rule for judicial review of agency decisions, the denied plan or amendment is effective and applies to the zone during the appellate process. *See* TEX. WATER CODE § 26.179(g); *cf.* § 26.177(d) (the TNRCC's ruling on city water pollution abatement regulation remains in effect for all purposes during appeal of the ruling). Although the statute does not expressly limit this particular provision's application to landowners with 1,000 acres or more, we interpret this provision to apply only to these larger landowners and not to landowners with 500 to 1,000 acres. This is because the latter group's plans and amendments are not effective until the TNRCC approves them and therefore cannot apply to development in the zone during the appeal of a TNRCC denial. Also atypical of review procedures, for both small and large zones, the TNRCC has the burden of proof on appeal. *See* TEX. WATER CODE § 26.179(g); *cf. City of San Antonio v. Texas Water Comm'n,* 407 S.W.2d 752, 758 (Tex.1966) (the party appealing the TNRCC's order has the burden to show that the evidence does not reasonably support the order).

Once the TNRCC approves a plan, the statute requires landowners purporting to maintain background levels of water quality to monitor water quality. *See* TEX. WATER CODE § 26.179(b). But monitoring is not required until after each phase of development is completed, and then, monitoring is only required for three years. *See* TEX. WATER CODE § 26.179(b). Further, there is no requirement that development occur in phases. Therefore, monitoring might not be required until a zone is completely developed, which could take years. During the three-year monitoring period, the landowner must summarize the monitoring results, describe the best management practices being used in the zone, and annually submit them to the TNRCC in a technical report for review. *See* TEX. WATER CODE § 26.179(b). If the reports reveal that background levels were not maintained during the previous year, the landowner must modify the water quality plan but only *for future development phases* in the zone and *only to the extent reasonably feasible and practical. See* TEX. WATER CODE § 26.179(b)(1). The statute requires modification of operational and maintenance practices in existing phases, but again, only *to the extent reasonably feasible and practical. See* TEX. WATER CODE § 26.179(b)(2).

The TNRCC reviews the landowners' modifications and determines whether they modify plans and practices to the extent required under the statute, that is, to the extent reasonably feasible and practical. *See* TEX. WATER CODE § 26.179(g) (providing that the TNRCC reviews all amendments to water quality plans). But as is true for TNRCC review of initial water quality plans, for landowners owning 1,000 acres or more, modifications and amendments to plans are effective immediately upon recordation and remain effective during TNRCC review and an appeal of a TNRCC denial. *See* TEX. WATER CODE § 26.179(g). Further, for zones of all sizes, the TNRCC has the burden of proof on appeal of a denial of a modification. *See* TEX. WATER CODE § 26.179(g).

Therefore, regardless of the modifications actually necessary to achieve section 26.179's objectives, any modification is required only to the extent it is reasonably feasible and practical. Further, plan modifications are only required for future phases of development in the zone. It follows that if the landowner does not develop in phases, the landowner need not modify even a grossly insufficient water quality plan, because there are no future phases for which the statute requires plan

modification. *See* 21 Tex. Reg. 11611 (1996). Further, because monitoring is required only after development is complete, or after a phase of development, if any, is complete, extensive modifications of existing operational and maintenance practices, even if needed to achieve section 26.179's water quality objectives, may not be reasonably feasible and practical, and consequently not required. And, as development continues in zones of 1,000 acres or more during TNRCC review of modifications, necessary modifications likely become less feasible and practical.

 The TNRCC has even less enforcement power in zones purporting to retain the first 1.5 inches of rainfall from developed areas. The statute states that, for these zones, "[w]ater quality monitoring shall not be required." Tex. Water Code § 26.179(b). Moreover, all of the statute's language about monitoring and submitting annual reports falls under the first paragraph in subsection 26.179(b), which expressly refers to zones maintaining background water quality levels. *See* Tex. Water Code § 26.179(b). Nevertheless, the TNRCC has promulgated rules requiring zones retaining rainfall to maintain certain records and submit them, along with an assessment of the water quality plan's success in meeting the TNRCC's water quality requirements. *See* 30 Tex. Admin. Code § 216.8(a)(2), (a)(3), (b). To the extent the TNRCC's rules require monitoring of water quality in these zones, they are contrary to the statute's plain language prohibiting the TNRCC from requiring such monitoring. Indeed, the Landowners' comments to proposed TNRCC rules note that the TNRCC's reporting requirements for zones retaining rainfall were "excessive and unnecessary." 21 Tex. Reg. 11613 (1996). Although we defer to administrative interpretations of legislation, we do so only when they are reasonable interpretations. *See* Tex. Gov't Code § 311.023(6); *Public Util. Comm'n,* 883 S.W.2d at 196. Contrary to the TNRCC's interpretation, the statute's plain language prohibits the TNRCC from monitoring or requiring monitoring of water quality in these zones. *See* Tex. Water Code § 26.179(b). Not surprisingly, all but one of the zones filed with the TNRCC elected to retain the first 1.5 inches of rainfall from developed areas instead of maintaining background levels of water quality. *See* 21 Tex. Reg. 11605 (1996).

Finally, the TNRCC has very limited power over the decision to designate a zone. The TNRCC does have pre-approval power over zone designations of 500 to 1,000 acres. But the statute does not allow the TNRCC to de-designate any zone for noncompliance with section 26.179 or other applicable regulations. Similarly, in *Boll Weevil,* although the Commissioner of Agriculture could dissolve the foundation once the Commissioner determined the foundation had fulfilled its eradication purpose or had become inoperative or abandoned, the Commissioner had no power to dissolve the foundation for noncompliance with applicable statutory requirements. *See Boll Weevil,* 952 S.W.2d at 473. This fact weighed heavily against the delegation. *See Boll Weevil,* 952 S.W.2d at 473. Here, the TNRCC has no authority whatsoever to dissolve or de-designate a zone for noncompliance with section 26.179 or other water quality protection laws and regulations. This fact similarly weighs against the delegation here.

We conclude that, while the landowners' powers under section 26.179 are subject to some TNRCC review, the review is not *meaningful* as the first factor requires. Instead, the statute allows a landowner with 1,000 acres or more to develop before TNRCC approval and during the appeal of a TNRCC denial. Further, it allows landowners of zones of all sizes to lock into an insufficient water quality protection plan by developing under the plan before any monitoring for the plan's effectiveness in protecting water quality is required. And, as development continues in larger zones during TNRCC review and the appellate

process, necessary modifications become less and less feasible and practical, and are therefore less likely to be required.

While the landowners' water quality plans are subject to some TNRCC review, the landowners' authority to decide which municipal regulations can be enforced on their property is not subject to *any* TNRCC review. By designating a zone, a landowner exempts himself from the enforcement of municipal ordinances relating to land use, nuisance abatement, pollution control, water quality, subdivision requirements, and any other municipal environmental regulation that is "inconsistent with the land use plan and the water quality plan or which in any way limit, modify, or impair the ability to implement and operate the water quality plan and the land use plan within the zone as filed." TEX. WATER CODE § 26.179(i). While section 26.179 does provide some TNRCC oversight of water quality protection plans, it does not give the TNRCC or any other governmental agency the authority to review the landowners' power to exempt themselves from the enforcement of their choice of city regulations and powers. Of course, courts could eventually decide disputes about whether certain municipal ordinances are inconsistent with water quality and land use plans. But, as discussed earlier, the landowner makes the initial decision about which municipal regulations can be enforced on its property without *any* governmental oversight.

Because the landowners' powers under section 26.179 are not subject to meaningful governmental review, the first factor weighs heavily against the delegation.

### 2. Representation of Affected Persons

Section 26.179 does not afford adequate representation to those affected by the landowners' actions. Therefore, this factor also weighs against the delegation.

As discussed previously, the landowners' actions in creating and implementing water quality plans could adversely affect neighbors, downstream water users, and the public generally. The statute requires that the landowners give notice of zone designations to the municipality within whose ETJ a zone is located and the county in which the property is located. *See* TEX. WATER CODE § 26.179(f). But section 26.179 *prohibits* the TNRCC from requiring a public hearing on a water quality plan. *See* TEX. WATER CODE § 26.179(g). This is contrary to the TNRCC's general power to hold public hearings on the administration of chapter 26 of the Water Code, and the TNRCC's duty to hold public hearings on the TNRCC's water quality standards, on discharge permit applications, and on orders regulating the Edwards Aquifer. *See* TEX. WATER CODE §§ 26.020, .024, .028,. 029, .046.

The statute expressly provides landowners the right to appeal TNRCC *denial* of a water quality plan to a court of competent jurisdiction. *See* TEX. WATER CODE § 26.179(g). But the statute does not confer any party the right to appeal TNRCC *approval* of a plan or zone designation. Section 5.351 of the Water Code generally allows affected persons to seek a court order setting aside, modifying or suspending a ruling, order, decision, or other act of the TNRCC. *See* TEX. WATER CODE § 5.351(a). Nevertheless, a plain reading of section 26.179 leads us to conclude that the Legislature did not intend to confer a right to appeal any act under section 26.179 except TNRCC denial of a plan. That section 26.179(g) expressly confers a right to appeal the denial of a plan but is devoid of similar language allowing an appeal of a plan, its approval, or zone designation is significant. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex.1981) (holding that every word or phrase excluded from a statute must be presumed to have been excluded for a purpose). This is especially true given the language of section 26.177(d), which expressly confers a right to appeal to "[a]ny person affected by any ruling, order, decision, ordinance, program, resolution, or other act of a city relating to water pollu-

tion control and abatement." TEX. WATER CODE § 26.177(d). Section 26.177(d) shows that the Legislature knows how to provide a right of appeal to persons affected by a water quality plan or government action relating to a plan. Yet, the Legislature chose not to provide such a right to persons affected by section 26.179 plans or TNRCC approval of plans.

In addition, the landowners alone decide which municipal regulations cannot be enforced in their zones. The statute requires that landowners give applicable counties and municipalities notice of their zone designations, which includes a description of proposed land uses and a water quality plan. See TEX. WATER CODE § 26.179(e), (f). This provides constructive notice of the land use and water quality plans to affected members of the public. But the statute does not require the landowners to notify anyone, including neighboring property owners or downstream water users, about the municipal regulations that cannot be enforced on their property because they interfere with the land use or water quality plan. And, although affected persons retain their common law causes of action, the statute does not provide any right of review of the landowners' decisions about their land use or water quality plans to affected individuals or to the municipality.

Because the statute provides inadequate representation of persons affected by the delegates' actions, this factor weighs against the delegation.

### 3. Power to Apply the Law to Particular Individuals

This factor weighs in favor of the delegation. The landowners have the power to create water quality plans and apply them to their property and to decide which municipal regulations are enforceable on their property. Again, these powers may affect particular individuals, such as neighboring landowners and downstream water users. But section 26.179 does not give the landowners the power to *apply the law* to particular individuals other than themselves and their successors in interest. See TEX. WATER CODE § 26.179(h) ("The water quality plan for a zone shall be a covenant running with the land.").

In *Boll Weevil*, this factor weighed against the delegation because of the foundation's power to directly apply the law to third parties. See *Boll Weevil*, 952 S.W.2d at 474. The foundation had the power to impose penalties for late payment and to enter private property for any purpose under the statute, including the treatment, monitoring, and destruction of crops. See *Boll Weevil*, 952 S.W.2d at 458. Here, the landowners have no power to apply the law to third parties other than their successors. See TEX. WATER CODE § 26.179(h). Therefore, we conclude that this factor weighs in favor of the delegation.

### 4. Pecuniary Interest and Public Function

As we stated earlier, this factor weighs heavily in delegations to private interested parties. We conclude that it weighs heavily against the delegation here.

Landowners under section 26.179 obviously have a pecuniary interest that may conflict with their public function. The Landowners concede that those who designate their property as a zone have an interest in protecting their property values. The Landowners argue, though, that they do not have a public function. As we have already explained, section 26.179 allows landowners to regulate water quality and to decide which municipal regulations cannot be enforced on their property. Because these powers affect the public interest, the landowners do have a public function. Undeniably, the landowners' pecuniary interest in maximizing profit and minimizing costs may conflict with this public function.

### 5. Criminal Authority

The fifth factor weighs in the delegation's favor. Although section 26.179 al-

lows landowners to exempt themselves from municipal regulations that may be otherwise enforced with criminal penalties, it does not empower landowners to define criminal acts or impose criminal sanctions.

### 6. Duration, Extent, and Subject Matter of Delegation

The sixth factor weighs against the delegation. The delegation's subject matter is fairly narrow. The statute delegates to private landowners the power to govern water quality and land use only on their own property and that of their successors in interest. And, the landowners are still subject to existing state and TNRCC water quality regulations and additional regulations necessary to comply with federal standards.

But the extent of the delegation is fairly broad. Landowners have the power to create, implement, and enforce their own water quality plans. *See* Tex. Water Code § 26.179(b), (d), (f), (g). These plans could adversely affect the public interest and the interests of neighbors and downstream water users. Yet, these plans apply to development in zones with 1,000 acres or more before TNRCC approval, and even after a TNRCC denial if the landowners appeal the denial. *See* Tex. Water Code § 26.179(g). Further, for those plans for which water quality monitoring is required, even if monitoring reveals that the plans are not achieving section 26.179's objectives, the plans need not be modified except in future phases of development, if any. *See* Tex. Water Code § 26.179(b). *Modifications are required only to the extent reasonably feasible and practical. See* Tex. Water Code § 26.179(b). Therefore, as we noted in our discussion of the first factor, the landowners have broad discretion in actually complying with section 26.179's water quality objectives. Landowners also have the power to exempt their property from the enforcement of any city regulations that are inconsistent with their water quality plan and land use plan or that could limit, modify, or impair the landowners' ability to implement those plans for the property. *See* Tex. Water Code § 26.179(i).

The delegation to the landowners is not narrow in duration either. The statute expressly provides that the water quality plan is a covenant running with the land. *See* Tex. Water Code § 26.179(h). A zone and the coordinate power to regulate water quality and exempt property from municipal laws exists until a city annexes the zone. *See* Tex. Water Code § 26.179(i). And section 26.179 prohibits annexation until 20 years after zone designation or until 90 percent of the zone's facilities and infrastructure are complete, whichever occurs first. *See* Tex. Water Code § 26.179(i). Thus, under the statute, if a city does not annex under subsection (i), the zone and the landowners' powers in the zone last indefinitely. This is contrary to the time limits found in other regulatory schemes. *See* Tex. Water Code § 26.029 ("In each permit, the commission shall prescribe the conditions on which it is issued, including the duration of the permit."); 30 Tex. Admin. Code § 213.4(h) ("[A]pproval of an Edwards Aquifer protection plan will expire two years after the date of initial issuance, unless prior to the expiration date, substantial construction related to the approved plan has commenced."). Therefore, this factor also weighs against the delegation.

### 7. Qualifications or Training

Section 26.179 does not require landowners to possess any special qualifications or training in land use planning, water quality management, or public health, safety, and welfare management. Therefore, ordinarily, this factor would weigh against the delegation. Nevertheless, the statute does require landowners to hire registered professional engineers to review their water quality plans and amendments. Accordingly, although the statute does not require the delegate to have relevant qualifications or training, it requires the delegate to hire a professional who does. Because

engineers have a professional obligation beyond their employers' self-interest, requiring their review makes it more likely that landowners will achieve section 26.179's water quality objectives than would requiring the landowners themselves to have engineering expertise.

Specifically, the statute requires that a professional engineer certify that a landowner's water quality plan achieves one of section 26.179's standards, either maintaining background levels of water quality or retaining rainfall. *See* Tex. Water Code § 26.179(g). Further, in zones purporting to maintain background levels of water quality, if data on background levels are unavailable, an engineer must calculate and certify the background levels to maintain. *See* Tex. Water Code § 26.179(b). And, a professional engineer must acknowledge that the landowner's subdivision plat complies with the water quality plan. *See* Tex. Water Code § 26.179(j)(2). Therefore, the statute provides a check on the landowner's discretion in formulating a water quality plan and a subdivision plat to comply with that plan.

In contrast, neither the engineer nor any other party with qualifications or training has *any* role in the landowner's decisions about which municipal regulations the landowner's water quality and land use plans will comply with and are therefore enforceable on its property.

Therefore, we conclude that this seventh factor weighs neither for nor against the delegation.

## 8. Sufficiency of Legislative Standards to Guide Delegates

This last factor weighs neither for nor against the delegation. Section 26.179 provides fairly detailed statutory standards to guide landowners in formulating their initial water quality plans. Landowners are given two broad standards for their water quality plans—maintain background levels of water quality or retain the first 1.5 inches of rainfall from developed areas. *See* Tex. Water Code § 26.179(a).

Retaining the first 1.5 inches of rainfall from developed areas is adequately specific, and the standards on determining and maintaining background levels are fairly specific. *See* Tex. Water Code § 26.179(a), (b). Further, the statute requires that development in the zones comply with all existing state and TNRCC water quality regulations and additional state regulations designed to comply with mandatory federal water quality standards. *See* Tex. Water Code § 26.179(k).

But section 26.179 provides little guidance on what to do if background water quality levels are not maintained. The statute simply directs the landowner to modify the plan for future phases of development and current operational and maintenance practices "to the extent reasonably feasible and practical." Tex. Water Code § 26.179(b). There is no time limit for submitting proposed modifications to the TNRCC, and for landowners with 1,000 acres or more, the modifications apply to zone activities during TNRCC review and even during the appeal of a TNRCC denial of a modification. *See* Tex. Water Code § 26.179(g). Further, as more development occurs, needed modifications become less feasible and practical. This standard is thus insufficient to guide landowners in modifying their plans to comply with section 26.179's requirements or the TNRCC in reviewing modifications to plans.

In *Proctor*, this Court held that a delegation of authority to private entities to select "qualified neutral arbitrators" to hear civil service commission appeals provided adequate guidance. *Proctor*, 972 S.W.2d at 738. In that case, however, the assessment of qualifications was uniquely within the delegate's expertise, and the term "neutral" was sufficiently specific to reflect legislative intent. Moreover, in *Proctor*, the authority delegated was narrow—to forward names of potential arbitrators for selection. The criteria "qualified" and "neutral" were well-suited for this narrow purpose. This contrasts

starkly with the delegation here, in which the elastic standards "reasonably feasible and practical" provide little guidance to the landowners in exercising their relatively broad authority.

Similarly, section 26.179 does not provide sufficient standards to guide the landowners in deciding which municipal regulations can be enforced on their property. Landowners can craft a land use or water quality plan without regard to municipal regulations. Those regulations that are "inconsistent with the land use plan and the water quality plan or which in *any way* limit, modify, or impair the ability to implement and operate the water quality plan and the land use plan within the zone as filed," are then not enforceable on the landowner's property. TEX. WATER CODE § 26.179(i) (emphasis added). This seems to allow the landowners to exempt themselves from the enforcement of municipal laws for any reason as long as it is somehow related to their water quality and land use plans.

This last factor weighs neither for nor against the delegation. But the *Boll Weevil* factors as a whole weigh against the constitutionality of delegation. Therefore, we conclude that section 26.179 of the Water Code is an unconstitutional delegation of legislative power to private landowners. We need not consider the additional grounds in the cross-motions for summary judgment. *See Doe*, 915 S.W.2d at 473.

## IV. ATTORNEY'S FEES

We conclude that the trial court did not abuse its discretion in denying the Landowners' claim for attorney's fees. Under the Texas Uniform Declaratory Judgment Act, the trial court has discretion in awarding attorney's fees "as are equitable and just." TEX. CIV. PRAC. & REM.CODE § 37.009; *see also Barshop*, 925 S.W.2d at 637. We affirm the trial court's judgment denying the Landowners' claims for attorney's fees.

## V. CONCLUSION

We hold that section 26.179 of the Texas Water Code is an unconstitutional delegation of legislative power to private landowners. We also hold that the trial court did not abuse its discretion in denying the Landowners' claims for attorney's fees. Accordingly, we affirm the trial court's judgment.

Justice OWEN filed a dissenting opinion, in which Justice HECHT and Justice ABBOTT joined.

Justice ABBOTT filed a dissenting opinion, in which Justice HECHT and Justice OWEN joined.

Justice OWEN, joined by Justice HECHT and Justice ABBOTT, dissenting.

I strongly dissent from what the Court has wrought today. The importance of this case to private property rights and to the separation of powers between the judicial and legislative branches of government cannot be overstated. The Legislature is *forbidden by the Texas Constitution*, the Court says, from allowing property owners to make decisions about how they use and develop their own land. While the Constitution certainly permits the Legislature to enact laws that preserve and conserve the State's natural resources, there is nothing in the Constitution that requires the Legislature to exercise that power in any particular manner. How the Legislature chooses to regulate is left to the Legislature, not this Court. Our Constitution plainly states that in preserving and conserving our natural resources, "the Legislature shall pass all such laws as may be appropriate thereto." TEX. CONST. art. XVI, § 59(a). Instead of seeking to uphold the laws that the Legislature has passed toward that end, the Court has seized upon the rarely used nondelegation doctrine to claim constitutional authority for an unprecedented restriction of the Legislature's power and an equally unprecedented restriction on private property rights.

The Court's holding today raises profoundly disturbing questions. Does the way in which the Legislature regulates water quality on private property in rural areas unconstitutionally delegate legislative powers to private property owners? Does the Legislature's regulation of water quality in suburban areas that are outside a city's extraterritorial jurisdiction amount to an unconstitutional delegation? The answer to these questions should be no, and when the Court's opinion is examined with that in mind, the dearth of logic in the Court's decision is apparent.

I am at a loss to understand what is driving the Court's opinion, since it clearly is not reasoned decision-making. I know only that the Court today exercises raw power to override the will of the Legislature and of the people of Texas. The Court strikes a severe blow to private property rights and usurps authority that is reserved to another branch of government—the Legislature. If the Court has any intention of applying the holdings in this case to future cases, the Court will impair all manner of property rights, and hamstring the Legislature's ability to function as the Texas Constitution and the people of Texas intend that it should.

This case should have been resolved by applying two straightforward principles of law. The first is that it is not an unconstitutional delegation to restore to private landowners in a city's extraterritorial jurisdiction property rights that other landowners across the state enjoy. The second is that the City of Austin had authority to regulate within its ETJ only because the Legislature granted it that authority. What the Legislature grants, it may take away from its own subdivisions.

# I

The Water Code provisions at issue apply to the ETJs of certain cities.[1] The Court spends a considerable amount of time characterizing these provisions. I include them in Appendix A so that readers can see for themselves what the Code provisions say.

The Court does not and cannot dispute that the Legislature's purpose in promulgating these statutes was to balance several considerations, chief among them being the need to maintain water quality and the desire not to unduly hinder economic development in this State. See TEX. WATER CODE § 26.003.[2] The Legislature enacted section 26.179 of the Water Code because it concluded that at least one city, namely Austin, had abused the authority the Legislature had given it under section 26.177[3] to regulate water pollution within its ETJ, and that other cities could do the same. By passing section 26.179,[4] the Legislature restored to landowners some of the freedom from regulation that they enjoyed before their land was engulfed by a city's ETJ.

Briefly summarized, the Legislature gave large landowners within certain cities' ETJs an election. Owners of at least 500 contiguous acres of land in those ETJs could decide either to continue to abide by the city's water quality ordinances adopted under section 26.177, or meet one of two different state-mandated water quality standards under section 26.179. The first state-granted option was to maintain background levels of water quality in waterways, and the second was to capture and retain the first 1.5 inches of rainfall from developed areas. See id. § 26.179(a). Section 26.179 and regulations promulgated under it by the Texas Natural Resources Conservation Commission set forth specific directions as to how these water quality levels were to be achieved

1. I, like the Court, cite the 1995 version of the Water Code unless otherwise indicated. The 1999 amendments to the Water Code do not apply to this case.

2. See infra Appendix A.

3. See infra Appendix A.

4. See infra Appendix A. The trial court held that section 26.179 was unconstitutional.

and verified. *See id.*; 30 TEX. ADMIN. CODE §§ 216.1–.11. (1996).

The Court concedes, as it must, that in addition to the requirements of section 26.179, landowners are required to meet all other then-existing state water quality regulations as well as all future regulations necessary to comply with federal standards, and that landowners are subject to the TNRCC's power to enforce those regulations. *See* 22 S.W.3d at 880. Thus, landowners within an affected city's ETJ are subject to *more* state regulation than are landowners just a few feet outside an ETJ and rural landowners all across Texas.

The question, then, concerning landowners within *and outside* cities' ETJs is whether the State's scheme of regulating water quality amounts to an unconstitutional delegation of legislative power. I turn to that question.

## II

The Court's opinion focuses extensively on the types of city ordinances that would no longer apply within an ETJ if a landowner elected to create a water quality protection zone and to comply with State as opposed to city water quality standards. *See, e.g.*, 22 S.W.3d at 875. Under section 26.179(i), the Legislature prohibited a city from acting within its ETJ to abate nuisances, control pollution, or enforce any environmental regulations that were inconsistent with a land use and water quality plan filed by a landowner in connection with a water quality protection zone. *See* TEX. WATER CODE § 26.179(i). And the Legislature prohibited a city from annexing land in such a zone until the earlier of twenty years from the date the zone is designated or when at least ninety percent of all facilities and infrastructure described in the water quality plan for the zone have been completed. *See id.*

The Court finds these aspects of section 26.179 particularly offensive. Yet a city cannot enforce any of its ordinances even one yard beyond its ETJ. Does this mean that landowners just outside a city's ETJ have been delegated legislative power because they may use their land free from regulation by a city? Obviously, the answer is no. The vast majority of land in Texas lies outside the boundaries of a city's ETJ. It is ludicrous to suggest that, since there are no regulations comparable to city nuisance and environmental regulations in rural areas or suburban areas outside ETJs, the Legislature has unconstitutionally allowed landowners to develop their property free from this type of governmental oversight.

The Court also totally ignores the fact that a city could not regulate water quality within its ETJ *at all* unless the Legislature gave it that authority. It is not an unconstitutional delegation when the Legislature restores landowners within a city's ETJ to the same status as those outside a city's ETJ. Under section 26.179, the Legislature simply returned to landowners within an ETJ rights that other landowners all across Texas enjoy.

The rhetoric that is laced throughout the Court's opinion, such as the statement that "landowners' power to exempt themselves from the enforcement of municipal regulations is also a legislative power," 22 S.W.3d at 875, is no substitute for sound analysis of fundamental legal principles and concepts. The Court elevates a city's power to regulate over that of the State. This is indefensible. If the State disapproves of regulations that cities have extended to their ETJs, the State may abolish those regulations or even abolish the ETJs in their entirety. It follows as surely as night follows day that a State may therefore release landowners in an ETJ from the grip of city regulation without unconstitutionally delegating legislative power.

## III

The provision in the Texas Constitution that prohibits the Legislature from delegating its legislative powers to private citi-

zens is Article III, Section 1.[5] *See Proctor v. Andrews,* 972 S.W.2d 729, 732–33 (Tex. 1998). Historically, what private property owners have chosen to do with their own land has not been a "legislative power."

In 1917, the Texas Constitution was amended to provide that the preservation and conservation of natural resources, including water, were "public rights and duties" and that "the Legislature shall pass all such laws as may be appropriate thereto." TEX. CONST. art. XVI, § 59(a). This provision does not strip away private property owners' rights to decide how to develop their land. It only directs the Legislature to pass "all such laws as may be appropriate" to preserve and conserve water. *Id.* Accordingly, landowners retain the right to make decisions about the development of their own property, subject to laws that the Legislature may pass regarding conservation and preservation of water. A private landowner's decision about how to develop property does not become the exercise of "legislative power" within the meaning of Article III, Section 1 by virtue of Article XVI, Section 59.

The Court's quarrel with the Legislature is, at bottom, not a question of delegation, but a question of whether, in the Court's view, the laws that the Legislature has passed are "appropriate" to preserve and conserve water. *Id.* The Court has overstepped constitutionally prescribed boundaries. It is for the Legislature to decide what laws are "appropriate" to conserve water. That is not a function of this or any other court.

The statutes under scrutiny in this case permit landowners to make decisions, within limits, about how to use *their own property.* The Court concedes that section 26.179 does not give landowners "power over the private property of others," or "the power to apply the law to particular individuals other than themselves and

their successors in interest." 22 S.W.3d at 879–80. The Court, however, struggles mightily to conjure up examples of how landowners' use of their own land might *indirectly* affect third parties. *See* 22 S.W.3d at 879. But those effects are no different from the effects that any use of land may have on a neighbor or on third parties tens or hundreds of miles away. The use of one's own property does not implicate a delegation of legislative power. A delegation of legislative authority to private individuals or entities necessarily contemplates that those individuals or entities will have some direct say so over third parties. In cases that the Court cites regarding delegation, a private individual or group was empowered to directly control the actions or rights of another. *See, e.g., Texas Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454 (Tex. 1997); *County of Fairfax v. Fleet Indus. Park L.P.,* 242 Va. 426, 410 S.E.2d 669 (1991); *Bayside Timber Co. v. Board of Supervisors,* 20 Cal.App.3d 1, 97 Cal.Rptr. 431 (1971). That is not what is at issue here.

The Court says that "[w]ater quality regulation is a legislative power." 22 S.W.3d at 875. I agree. But I disagree with the Court that the Legislature has delegated water quality regulation to landowners under section 26.179. It is the Legislature who has determined the water quality standards. A landowner who elects not to comply with city ordinances that cover water quality must meet the State's standards. Specifically, a landowner must have a plan for maintaining background levels of water quality in waterways or maintaining the first 1.5 inches of rainfall from developed areas. *See* TEX. WATER CODE § 26.179. Section 26.179 includes detailed requirements for maintaining background levels of water quality. *See id.* § 26.179(b). A landowner must

---

5. The Texas Constitution provides:
 1. Senate and House of Representatives
 Sec. 1. The Legislative power of this State shall be vested in a Senate and House of Representatives, which together shall be styled "The Legislature of the State of Texas."
 TEX. CONST. Art. III, § 1.

also meet all then-existing state laws regarding water quality and all future state laws to the extent necessary to comply with federal law. *See id.* § 26.179(k), (m).

The Court insists that section 26.179 results in a delegation because legislative power includes "the power to provide the details of the law, to promulgate rules and regulations to apply the law, and to ascertain conditions upon which existing laws may operate." 22 S.W.3d at 873. First, the *Legislature* has set forth the laws that must be followed within section 26.179 itself. The only matter left to a landowner is how he will physically capture the first 1.5 inches of rainfall or maintain background levels of water quality. Complying with the law is not the same as making the law. Second, nothing in section 26.179 gives landowners the power to make rules or regulations. Section 26.179 requires a landowner to submit a plan showing how it intends to meet the State-mandated water quality standards. That does not amount to giving landowners rule-making authority. But even if a water quality protection plan under section 26.179 could legitimately be characterized as imposing rules, to whom would those rules apply? As we have seen, the inescapable answer is that the plan only applies to the landowner who files it and his successors in interest. The Court concedes as well that section 26.179 does not give landowners any authority over the property of others. 22 S.W.3d at 877. Directing landowners to file and implement a water quality control plan that applies only to their own property does not amount to a delegation of legislative power.

The Legislature has determined the consequences if a landowner fails to meet the State-prescribed water quality standards. The Court obviously believes that those consequences are not severe enough. It extensively criticizes the Legislature's scheme for regulating water quality, apparently finding it too minimal. *See, e.g.,* 22 S.W.3d at 878–79. But that is not a call for this Court to make. The Legislature is empowered by the Texas Constitution to pass "all such laws as may be appropriate" to preserve and conserve water. TEX. CONST. art. XVI, § 59. The Legislature has done so. It has not delegated that responsibility to landowners. The Court cannot use its power to strike down legislation as unconstitutional simply because the Court does not think that the legislation goes far enough to maintain water quality in Austin, Texas.

## IV

The Court's determination to strike down water quality laws rather than trying to uphold them is apparent when it applies the *Boll Weevil* factors. I would not reach those factors because there has been no delegation here. But I think it is important to illuminate the shallowness and transparency of the Court's reasoning in its discussion of these factors and the Court's failure to abide by the longstanding common-law tenet that " '[i]f under any possible state of facts an act would be constitutional, the courts are bound to presume such facts exist.' " *Texas Workers' Compensation Comm'n v. Garcia,* 893 S.W.2d 504, 520 (Tex.1995) (quoting *Corsicana Cotton Mills, Inc. v. Sheppard,* 123 Tex. 352, 71 S.W.2d 247, 250 (1934)).

Although the Court concludes that the third and fifth *Boll Weevil* factors weigh in favor of finding the "delegation" constitutional, the Court finds that the remaining factors tip the scales the other way. First, the Court says, there is no meaningful governmental review. This is belied by the fact that the TNRCC has rejected landowners' plans for a water quality protection zone under section 26.179 forty percent of the time. If the TNRCC is not providing meaningful review, why is it rejecting plans so frequently? Nevertheless, the Court is resolute in its failure to apply the well-established requirement for holding that a statute is unconstitutional on its face, namely, "that the statute, by its terms, *always* operates unconstitutionally." *Garcia,* 893 S.W.2d at 518 (emphasis

added). How can the Court justify an ivory-tower pronouncement that this statute can never afford meaningful agency review when over in the agency offices meaningful review is actually happening, unless the Court has simply determined to say whatever it takes, true or not, to strike down this statute?

The Court also glosses over the fact that unless a zone has 1,000 or more acres, the plan cannot go into effect unless and until the TNRCC approves it. Then, the Court finds fault with the fact that the Legislature has placed the burden of proof on the TNRCC if an application is denied. Are we really prepared to say that the constitutionality of a statute turns on who has the burden of proof? Why should the State *not* have the burden of proof here? The State has the burden of proof when it seeks to restrict the exercise of rights such as those to life and liberty.

The Court's obsession with elevating city ordinances above state regulation also crops up again in its analysis of the adequacy of governmental regulation and in its analysis of the fourth and sixth *Boll Weevil* factors. *See* 22 S.W.3d at 885, 886–87. But, as discussed above, the facts that the State rather than a city regulates, and that the State's regulations are less onerous than a city's, do not mean that the State has delegated its regulatory power to the private sector.

In analyzing the second *Boll Weevil* factor, the Court faults section 26.179 because it does not provide for public hearings to give third parties an opportunity to be heard and it does not give a right of appeal to third parties. *See* 22 S.W.3d at 884–85. When a landowner in rural West Texas, who is far from a city's ETJ, decides to subdivide and develop his property, is a hearing necessary so that neighbors or downstream water users can lodge complaints? If the Legislature does not provide some means for third parties to appeal a landowner's decision to subdivide and develop rural property, has the Legislature unconstitutionally delegated legislative power to the private sector? I submit that the answer to these questions is a resounding "no," and that the answer should be the same for other property owners in this state, regardless of whether their land is located within a city's ETJ.

## V

I fully join in JUSTICE ABBOTT's dissent, including his analysis of the City's other constitutional challenges to section 26.179. Accordingly, I would reverse the trial court's judgment and render judgment that section 26.179 of the Texas Water Code is not unconstitutional for any of the reasons advanced by the City of Austin.

\* \* \* \* \*

In sum, the Court says that landowners trapped within a city's ETJ are somehow on different constitutional footing than rural or even suburban landowners who are not in a city's limits or a city's ETJ. The State must, the Court says, impose extensive regulations in place of city ordinances or else the State has unconstitutionally delegated legislative authority. Because the Court's conclusion is so obviously flawed and because the Court's ruling is an impermissible incursion into the domain of the Legislature, I dissent.

## APPENDIX A

### 1995 Texas Water Code Provisions

§ *26.003.* Policy of This Subchapter

It is the policy of this state and the purpose of this subchapter to maintain the quality of water in the state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, the operation of existing industries, and the economic development of the state; to encourage and promote the development and use of regional and area-wide waste collection, treatment, and disposal systems to serve the waste disposal needs of the citizens of the state; and to

require the use of all reasonable methods to implement this policy.

§ *26.011.* In General

Except as otherwise specifically provided, the commission shall administer the provisions of this chapter and shall establish the level of quality to be maintained in, and shall control the quality of, the water in this state as provided by this chapter. Waste discharges or impending waste discharges covered by the provisions of this chapter are subject to reasonable rules or orders adopted or issued by the commission in the public interest. The commission has the powers and duties specifically prescribed by this chapter and all other powers necessary or convenient to carry out its responsibilities. This chapter does not apply to discharges of oil covered under Chapter 40, Natural Resources Code.

§ *26.177.* Water Pollution Control Duties of Cities

(a) Every city in this state having a population of 5,000 or more inhabitants shall, and any city of this state may, establish a water pollution control and abatement program for the city. The city shall employ or retain an adequate number of personnel on either a part-time or full-time basis as the needs and circumstances of the city may require, who by virtue of their training or experience are qualified to perform the water pollution control and abatement functions required to enable the city to carry out its duties and responsibilities under this section.

(b) The water pollution control and abatement program of a city shall encompass the entire city and, subject to Section 26.179 of this code, may include areas within its extraterritorial jurisdiction which in the judgment of the city should be included to enable the city to achieve the objectives of the city for the area within its territorial jurisdiction. The city shall include in the program the services and functions which, in the judgment of the city or as may be reasonably required by the commission, will provide effective water pollution control and abatement for the city, including the following services and functions:

(1) the development and maintenance of an inventory of all significant waste discharges into or adjacent to the water within the city and, where the city so elects, within the extraterritorial jurisdiction of the city, without regard to whether or not the discharges are authorized by the commission;

(2) the regular monitoring of all significant waste discharges included in the inventory prepared pursuant to Subdivision (1) of this subsection;

(3) the collecting of samples and the conducting of periodic inspections and tests of the waste discharges being monitored to determine whether the discharges are being conducted in compliance with this chapter and any applicable permits, orders, or rules of the commission, and whether they should be covered by a permit from the commission;

(4) in cooperation with the commission, a procedure for obtaining compliance by the waste dischargers being monitored, including where necessary the use of legal enforcement proceedings;

(5) the development and execution of reasonable and realistic plans for controlling and abating pollution or potential pollution resulting from generalized discharges of waste which are not traceable to a specific source, such as storm sewer discharges and urban runoff from rainwater; and

(6) any additional services, functions, or other requirements as may be prescribed by commission rule.

(c) The water pollution control and abatement program required by Subsections (a) and (b) of this section must be submitted to the commission for review and approval. The commission may adopt rules providing the criteria for the estab-

lishment of those programs and the review and approval of those programs.

(d) Any person affected by any ruling, order, decision, ordinance, program, resolution, or other act of a city relating to water pollution control and abatement outside the corporate limits of such city adopted pursuant to this section or any other statutory authorization may appeal such action to the commission or district court. An appeal must be filed with the commission within 60 days of the enactment of the ruling, order, decision, ordinance, program, resolution, or act of the city. The issue on appeal is whether the action or program is invalid, arbitrary, unreasonable, inefficient, or ineffective in its attempt to control water quality. The commission or district court may overturn or modify the action of the city. If an appeal is taken from a commission ruling, the commission ruling shall be in effect for all purposes until final disposition is made by a court of competent jurisdiction so as not to delay any permit approvals.

(e) The commission shall adopt and assess reasonable and necessary fees adequate to recover the costs of the commission in administering this section.

§ *26.179.* Nonpoint Source Water Pollution Control Programs of Certain Municipalities

(a) In this section, "water quality protection" may be achieved by:

(1) maintaining background levels of water quality in waterways; or

(2) capturing and retaining the first 1.5 inches of rainfall from developed areas.

(b) For the purpose of Subsection (a)(1), "maintaining background levels of water quality in waterways" means maintaining background levels of water quality in waterways comparable to those levels which existed prior to new development as measured by the following constituents: total suspended solids, total phosphorus, total nitrogen, and chemical and biochemical oxygen demand. Background levels shall be established either from sufficient data collected from water quality monitoring at one or more sites located within the area designated as a water quality protection zone or, if such data are unavailable, from calculations performed and certified by a registered professional engineer utilizing the concepts and data from the National Urban Runoff Program (NURP) Study or other studies approved by the Texas Natural Resource Conservation Commission (commission) for the constituents resulting from average annual runoff, until such data collected at the site are available. Background levels for undeveloped sites shall be verified based on monitoring results from other areas of property within the zone prior to its development. The monitoring shall consist of a minimum of one stage (flow) composite sample for at least four storm events of one-half inch or more of rainfall that occur at least one month apart. Monitoring of the four constituents shall be determined by monitoring at four or more locations where runoff occurs. A minimum of four sample events per year for each location for rainfall events greater than one-half inch shall be taken. Monitoring shall occur for three consecutive years after each phase of development occurs within the Water Quality Protection Zone. Each new phase of development, including associated best management practices, will require monitoring for a three-year period. The results of the monitoring and a description of the best management practices being used throughout the zone shall be summarized in a technical report and submitted to the commission no later than April 1 of each calendar year during development of the property, although the commission may determine that monitoring is no longer required. The commission shall review the technical report. If the performance monitoring and best management practices indicate that background levels were not maintained during the previous year, the owner or developer of land within the water quality protection zone shall:

(1) modify water quality plans developed under this section for future phases of development in the water quality protection zone to the extent reasonably feasible and practical; and

(2) modify operational and maintenance practices in existing phases of the water quality protection zone to the extent reasonably feasible and practical.

Water quality monitoring shall not be required in areas using the methodology described by Subsection (a)(2).

(c) This section applies only to those areas within the extraterritorial jurisdiction, outside the corporate limits of a municipality with a population greater than 5,000, and in which the municipality either:

(1) has enacted or attempted to enforce three or more ordinances or amendments thereto attempting to regulate water quality or control or abate water pollution in the area within the five years preceding the effective date of this Act, whether or not such ordinances or amendments were legally effective upon the area; or

(2) enacts or attempts to enforce three or more ordinances or amendments thereto attempting to regulate water quality or control or abate water pollution in the area in any five-year period, whether or not such ordinances or amendments are legally effective upon the area.

(d) The owner or owners of a contiguous tract of land in excess of 1,000 acres that is located within an area subject to this section may designate the tract as a "water quality protection zone." Upon prior approval of the commission, the owner of a contiguous tract of land containing less than 1,000 acres, but not less than 500 acres, that is located within an area subject to this section may also designate the tract as a "water quality protection zone." The tract shall be deemed contiguous if all of its parts are physically adjacent, without regard to easements, rights-of-way, roads, streambeds, and public or quasi-public land, or it is part of an integrated development under common ownership or control. The purpose of a water quality protection zone is to provide the flexibility necessary to facilitate the development of the land within the zone, but which also is intended to result in the protection of the quality of water within the zone.

(e) A water quality protection zone designated under this section shall be described by metes and bounds. The designation shall include a general description of the proposed land uses within the zone, a water quality plan for the zone, and a general description of the water quality facilities and infrastructure to be constructed for water quality protection in the zone.

(f) Creation of a water quality protection zone shall become immediately effective upon recordation of the designation in the deed records of the county in which the land is located. The designation shall be signed by the owner or owners of the land, and notice of such filing shall be given to the city clerk of the municipality within whose extraterritorial jurisdiction the zone is located and the clerk of the county in which the property is located.

(g) The water quality plan for a zone, including the determination of background levels of water quality, shall be signed and sealed by a registered professional engineer acknowledging that the plan is designed to achieve the water quality protection standard defined in this section. On recordation in the deed records, the water quality plan shall be submitted to and accepted by the commission for approval, and the commission shall accept and approve the plan unless the commission finds that implementation of the plan will not reasonably attain the water quality protection as defined in this section. A water quality plan may be amended from time to time on filing with the commission, and all such amendments shall be accepted by the commission unless there is a finding that the amendment will impair the attainment

of water quality protection as defined in this section. The commission shall adopt and assess reasonable and necessary fees adequate to recover the costs of the commission in administering this section. The commission's review and approval of a water quality plan shall be performed by the commission staff that is responsible for reviewing pollution abatement plans in the county where the zone is located. The review and approval of the plan shall be completed within 120 days of the date it is filed with the commission. A public hearing on the plan shall not be required, and acceptance, review, and approval of the water quality plan or water quality protection zone shall not be delayed pending the adoption of rules. The commission shall have the burden of proof for the denial of a plan or amendments to a plan, and any such denial shall be appealable to a court of competent jurisdiction. The water quality plan, or any amendment thereto, shall be effective upon recordation of the plan or the amendment in the deed records and shall apply during the period of review and approval by the commission or appeal of the denial of the plan or any amendment.

(h) The water quality plan for a zone shall be a covenant running with the land.

(i) A municipality may not enforce in a zone any of its ordinances, land use ordinances, rules, or requirements including, but not limited to, the abatement of nuisances, pollution control and abatement programs or regulations, water quality ordinances, subdivision requirements, other than technical review and inspections for utilities connecting to a municipally owned water or wastewater system, or any environmental regulations which are inconsistent with the land use plan and the water quality plan or which in any way limit, modify, or impair the ability to implement and operate the water quality plan and the land use plan within the zone as filed; nor shall a municipality collect fees or assessments or exercise powers of eminent domain within a zone until the zone has been annexed for the municipality. A water quality protection zone may be annexed by a municipality only after the installation and completion of 90 percent of all facilities and infrastructure described in the water quality plan for the entire zone as being necessary to carry out such plan or the expiration of 20 years from the date of designation of the zone, whichever occurs first.

(j) Subdivision plats within a water quality protection zone shall be approved by the municipality in whose extraterritorial jurisdiction the zone is located and the commissioners court of the county in which the zone is located if:

(1) the plat complies with the subdivision design regulations of the county; and

(2) the plat is acknowledged by a registered professional engineer stating that the plat is in compliance with the water quality plan within the water quality protection zone.

(k) A water quality protection zone implementing a water quality plan which meets the requirements of this section shall be presumed to satisfy all other state and local requirements for the protection of water quality; provided, however, that:

(1) development in the zone shall comply with all state laws and commission rules regulating water quality which are in effect on the date the zoning is designated; and

(2) nothing in this section shall supersede or interfere with the applicability of water quality measures or regulations adopted by a conservation and reclamation district comprising more than two counties and which apply to the watershed area of a surface lake or surface reservoir that impounds at least 4,000 acre-feet of water.

($l$)(1) One or more of the provisions of this section may be waived by the owner or owners of property that is or becomes subject to an agreement entered into after the effective date of this Act between the

owner or owners of land within the zone and the municipality. The agreement shall be in writing, and the parties may agree:

(A) to guarantee continuation of the extraterritorial status of the zone and its immunity from annexation by the municipality for a period not to exceed 15 years after the effective date of the agreement;

(B) to authorize certain land uses and development within the zone;

(C) to authorize enforcement by the municipality of certain municipal land use and development regulations within the zone, in the same manner such regulations are enforced within the municipality's boundaries, as may be agreed by the landowner and the municipality;

(D) to vary any watershed protection regulations;

(E) to authorize or restrict the creation of political subdivisions within the zone; and

(F) to such other terms and considerations the parties consider appropriate, including, but not limited to, the continuation of land uses and zoning after annexation of the zone, the provision of water and wastewater service to the property within the zone, and the waiver or conditional waiver of provisions of this section.

(2) An agreement under this section shall meet the requirements of and have the same force and effect as an agreement entered into pursuant to Section 42.046, Local Government Code.

(m) In addition to the requirements of Subsections (a)(1) and (a)(2), the commission may require and enforce additional water quality protection measures to comply with mandatory federal water quality requirements, standards, permit provisions, or regulations.

(n) This section does not apply to an area within the extraterritorial jurisdiction of a municipality with a population greater than 900,000 that has extended to the extraterritorial jurisdiction of the municipality an ordinance whose purpose is to prevent the pollution of an aquifer which is the sole or principal drinking water source for the municipality.

Justice ABBOTT, dissenting, joined by Justice HECHT and Justice OWEN.

I disagree with the Court's holding that section 26.179 unconstitutionally delegates legislative power to private landowners. I would hold that section 26.179 [1] is not an unconstitutional delegation and that it does not violate any of the other constitutional provisions asserted by the City in its motion for summary judgment. Accordingly, I dissent.

**I**

This case is not so much about water quality as it is about the power of local governments to regulate in their extraterritorial jurisdictions (ETJs). Local governments' power to regulate water quality in their ETJs derives solely from the authority granted them by the Legislature in section 26.177. By later passing section 26.179, the Legislature established comprehensive guidelines that empowered private landowners to make responsible decisions regarding water quality. In doing so, the Legislature reduced stifling regulations and administrative burdens imposed by cities under section 26.177. Today, the Court strips the Legislature of its legislative power to limit the regulatory authority it granted to local governments, and the Court improperly vests regulatory power in the hands of the City of Austin. The Court's decision usurps the Legislature's authority to determine public policy and to

**1.** All citations are to the Water Code unless otherwise noted. In addition, section 26.179 was amended while this case was pending. *See* Act of May 28, 1999, 76th Leg., R.S., ch. 1543, 1999 Tex. Gen. Laws 5310, 5310–13. Because those amendments are inapplicable to this case, all citations to section 26.179 are to the pre-amendment version.

make law and denigrates the private property rights of landowners. In addition, the Court demands more and more regulation, calling into question a number of existing and contemplated legislative policies and forcing the state down a dangerous road of increased regulation and administration and decreased privatization.

It is the Legislature's responsibility to regulate water quality in Texas. As noted, the Legislature chose to allow cities to regulate water quality in their ETJs via section 26.177. But the Court wholly fails to recognize that the Legislature has the power to rewrite, restrict, or even eliminate section 26.177 without violating the Texas Constitution. The City of Austin's right to regulate water in its ETJ was created by the Legislature. Surely it cannot be unconstitutional for the Legislature to limit that authority. Section 26.179 is merely a vehicle to do just that—it curtails the regulatory and administrative powers given to the City in section 26.177. But the Court concludes that this reduction in the City's regulatory authority is invalid, and in doing so the Court displaces the Legislature's policy decision with its own regarding how water should be regulated in Texas.

The necessary import of the Court's opinion is that by enacting section 26.177, the Legislature can delegate to local governments the authority to regulate, but its hands are tied when it wants to limit that authority. In reaching its conclusion, the Court fails to acknowledge that section 26.179 provides more comprehensive regulation of water quality for subject landowners than for the vast numbers of Texas landowners outside a city's ETJ who are not subject to section 26.177. It can only be presumed that the Court would hold that these numerous landowners are also somehow victims of an unconstitutional delegation of legislative authority. Given the Court's decision today, my suggestion to the Legislature is to eliminate section 26.177 and simply start over.

Besides improperly tying the Legislature's hands, the Court also fails to acknowledge the potential consequences of its decision. The Legislature has demonstrated its desire to empower individuals through a variety of privatization initiatives such as school choice and school vouchers.[2] Would the Court's opinion mandate that such policy choices be stricken as unconstitutional delegations? The same question applies to the Legislature's ability to establish private prisons.[3] And what about existing legislative grants of eminent domain power to private entities?[4] The Court cannot reconcile such policies with its decision. In addition to rendering the viability of these and other legislative policies questionable, the Court's decision leads the state down a dangerous path that requires more and more regulation and less privatization. It is the Legislature's policy choice—not the Court's—that should determine the amount of regulation needed.

Section 26.179 provides comprehensive water-quality regulation to applicable landowners. The Court concedes that section

---

2. *See* HOUSE RESEARCH ORG., BILL ANALYSIS, Tex. S.B. 1, 74th Leg., R.S. (1995); *see also* Colona, *The Privatization of Public Schools—A Statutory and Constitutional Analysis in the Context of* Wilkinsburg Education Association v. Wilkinsburg School District, 100 DICKINSON L.REV. 1027, 1048 (1996); Egle, Comment, *The Constitutional Implications of School Choice,* 1992 WIS. L.REV. 459, 505–07 (1992).

3. *See* Blakely & Bumphus, *Private Correctional Management: A Comparison of Enabling Legislation,* FED. PROBATION, June 1996, at 49; Dipiano, *Private Prisons: Can They Work? Panopticon in the Twenty-first Century,* 21 NEW ENG. J. ON CRIM. & CIV. CONFINEMENT 171, 172, 196, 199 (1995).

4. *See, e.g.,* TEX. NAT. RES.CODE § 111.019(a), (b) (granting common carriers eminent domain power); TEX.REV.CIV. STAT. § 161.125 (electric cooperatives); TEX.REV.CIV. STAT. § 162.124 (telephone cooperatives); TEX.REV.CIV. STAT. art. 3183b–1 (certain nonprofit charitable corporations affiliated with certain medical centers); TEX.REV.CIV. STAT. art. 6351 (railroad companies); TEX.REV.CIV. STAT. art. 6535 (electric railway companies).

26.179 provides fairly detailed statutory standards to guide landowners in formulating their initial water-quality plans. 22 S.W.3d at 887. And the Court concedes that in addition to the extensive requirements in section 26.179, landowners remain subject to pre-existing state water-quality regulations, future state water-quality regulations necessary to comply with federal standards, and the TNRCC's powers to enforce those regulations. 22 S.W.3d at 887-88. But the Court undertakes its own policy analysis and proclaims that the legislatively established regulations in section 26.179 are insufficient. The Court says the numerous applicable regulations do not go far enough and that private citizens have too much latitude to make their own decisions—despite the fact that the regulations the Court deems to be inadequate are so comprehensive that the Court's mere *synopsis* of them occupies nine paragraphs of its opinion.

Despite the numerous existing regulations, the Court wants more. The Court creates an impossible standard requiring the Legislature to regulate the minutia of land development. For example, although section 26.179(b) requires three years of monitoring after the completion ·of each phase of development, the Court wants more monitoring. The Court concludes that because the statute does not require that development occur in phases, no monitoring would be required until a zone is completely developed. 22 S.W.3d at 882. Although the statute may not require specific "phases," simple logistics surely requires that development occur in stages. Because the nature of developments may vary, the Legislature could not prescribe the number or types of phases for every development, and the Court should not attempt to force the Legislature to do so. Moreover, the Court complains that developers must modify water-quality plans only for future development phases. 22 S.W.3d at 882-83. But how could they modify in the past? And, section 26.179(b)(2) appropriately requires modifi-cation of operational and maintenance practices in existing phases whenever water quality has not been maintained.

Rather than requiring the Legislature to spell out every detail, it is well recognized that delegations need only establish "reasonable standards" sufficient to guide the entity to which the powers are delegated, especially when conditions must be considered that cannot be conveniently investigated by the Legislature. *See Railroad Comm'n v. Lone Star Gas Co.*, 844 S.W.2d 679, 689 (Tex.1992). As we have said, "[r]equiring the legislature to include every detail and anticipate unforeseen circumstances in the statutes which delegate authority ... would defeat the purpose of delegating legislative authority." *Id.* The Court now abandons these standards.

Last, although the Court claims to apply the standard of review for a facial challenge to a statute's constitutionality, 22 S.W.3d at 878, the Court fails to say what that standard is and fails to apply it. In a facial challenge such as this, it is the challenger's burden to show that the statute *always* operates unconstitutionally. *Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 623 (Tex.1996); *Texas Workers' Compensation Comm'n v. Garcia*, 893 S.W.2d 504, 518 (Tex.1995). Rather than demonstrating that section 26.179 always operates unconstitutionally, the Court ignores the standard, ignores the fact that the statute operated constitutionally when applied to two plans that were denied by the TNRCC, and instead insists on hypothesizing the ways in which the statute "could" operate unconstitutionally. In doing so, the Court fundamentally changes the analysis of a facial challenge as it has been repeatedly stated and applied by this Court and the United States Supreme Court. *See New York State Club Ass'n v. New York City*, 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988); *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) ("A facial chal-

lenge ... is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the [Act] might operate unconstitutionally under some conceivable set of circumstances is insufficient. ..."); *Wilson v. Andrews,* 10 S.W.3d 663, 669 (Tex.1999); *Barshop,* 925 S.W.2d at 623; *Garcia,* 893 S.W.2d at 518.

Although required to construe statutes to be constitutional whenever possible, the Court doggedly construes the statute in a manner that renders it unconstitutional. For example, the Court concludes that more monitoring is necessary, but then goes out of its way to hold that the TNRCC cannot require monitoring in zones opting to retain rainfall. Instead of micro-managing the Legislature and forcing an increase in needless regulation in this area and possibly many others, the Court should conduct a proper facial-challenge review and, as it is bound to do, construe the statute in a constitutional manner.

The only silver lining in the Court's opinion is its admittedly limited application. As the Court notes, 22 S.W.3d at 870 n. 1, the Legislature amended section 26.179 in 1999, but the amendments do not apply to this case. The Court appropriately has *not* said that the amended act is unconstitutional.

## II

## DELEGATION

The Court erroneously concludes that section 26.179 delegates to certain private landowners both the power to exempt themselves from otherwise applicable municipal regulations and the power to regulate water quality on their property and in waterways located on their property. To the contrary, the Legislature, by enacting section 26.179, did limit certain municipal powers under section 26.177, but it did not delegate the power to suspend laws or any other legislative authority to the land-owners. It simply curtailed the City's authority within its ETJ and provided the landowners with an alternative state-established and regulated water-quality scheme. Because the Legislature itself, via section 26.179(i), mandated that certain city regulations be suspended, and determined which regulations would be suspended, there has been no delegation of the power to suspend laws to the landowners. In addition, because the landowners must meet specific standards established by the Legislature in section 26.179 and because the landowners are comprehensively regulated by the TNRCC and existing state and federal laws in implementing those standards, section 26.179 does not delegate any other governmental authority to the landowners.

## A

In order to determine whether section 26.179 is an unconstitutional delegation of legislative power, it is important to understand the statutory framework within which section 26.179 exists. Chapter 26 of the Water Code governs water-quality maintenance and delegates primary responsibility for implementing water-quality management functions, including enforcement actions, to the TNRCC. *See* Tex. Water Code §§ 26.011, 26.0136. In addition, the Code delegates some water-quality maintenance responsibility to local governments. *See, e.g., id.* § 26.0136.

One such delegation occurred in 1971, when the Legislature delegated certain water-quality management authority to municipalities via section 26.177. The version of section 26.177 in effect in 1995 required that every city with a population of 5000 or greater establish a water-pollution-control and abatement program for the city, and also allowed smaller cities to do so. *See* Act of May 29, 1971, 62d Leg., R.S., ch. 612, § 7, 1971 Tex. Gen. Laws 1974, 1980. These city programs encompass the entire city and may include those areas within the city's ETJ that the city determines should be included to enable

the city to achieve its objectives for the area within its territorial jurisdiction. *See id.* § 26.177(b). Cities have broad powers to establish water-pollution-control programs under section 26.177, both in the city limits and in the ETJ. But this broad authority to regulate water quality in the ETJ is wholly derived from legislative grants of authority.

Similarly, a city's authority to regulate land development in its ETJ is wholly derived from a legislative grant of authority. Section 212.003 of the Local Government Code provides that a city may extend to the ETJ its municipal ordinances governing plats and subdivisions of land, but cannot regulate (1) the use of buildings or property, (2) the bulk, height, or number of buildings constructed, (3) the size of buildings, or (4) the number of residential units that can be built per acre. *See* TEX. LOC. GOV'T CODE § 212.003. If no municipal ordinances are extended to the ETJ, only county land-use regulations apply.

Austin's approach to protecting water quality under its section 26.177 authority has been to regulate land development, primarily by limiting the uses and development intensities of land. *See* Bray et al., *Environmental Permits: Land Use Regulation and Policy Implementation in Texas*, 23 ST. MARY's L.J. 841, 884 (1992). As noted, a city's authority to regulate land development in the ETJ under the Local Government Code is limited. But because Austin has used water-control measures under its section 26.177 authority to effectively limit land development—rather than using its express (but limited) authority to regulate land development under section 212.003 of the Local Government Code— the City has evaded most of the Local Government Code's limitations on cities' land-use regulation powers in the ETJ. *See generally Quick v. City of Austin*, 7 S.W.3d 109, 121 (Tex.1998).

In enacting section 26.179 in 1995, the Legislature responded to its belief that cities such as Austin were improperly using their section 26.177 authority to sub-

stantially regulate land development in the ETJ. *See* HOUSE RESEARCH ORG., BILL ANALYSIS, Tex. S.B. 1017, 74th Leg., R.S. (1995); SENATE COMM. ON NATURAL RESOURCES, BILL ANALYSIS, Tex. S.B. 1017, 74th Leg., R.S. (1995); HOUSE COMM. ON NATURAL RESOURCES, BILL ANALYSIS, Tex. S.B. 1017, 74th Leg., R.S. (1995); *Hearing on Tex. S.B. 1017 Before Senate Comm. on Natural Resources*, 74th Leg., R.S. 2–3 (April 4, 1995) (statement of Sen. Wentworth). The Legislature found that such regulation stifled economic development, in contravention of its stated Water Code policy:

> It is the policy of this state and the purpose of this subchapter to maintain the quality of water in the state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, the operation of existing industries, and the economic development of the state ... and to require the use of all reasonable methods to implement this policy.

TEX. WATER CODE § 26.003; *see also* HOUSE RESEARCH ORG., BILL ANALYSIS, Tex. S.B. 1017, 74th Leg., R.S. (1995). This policy recognizes the need to balance the competing interests of conserving and protecting natural resources with continuing existing commercial activities and future economic development. *See* Bray et al., *supra*, at 880. Thus, section 26.179 was intended to act as an "exception" to the ETJ authority granted to cities by section 26.177 of the Water Code. *See* TEX. WATER CODE § 26.177(b). Its purpose is to prevent city-established limitations on land development under their section 26.177 authority in order "to provide the flexibility necessary to facilitate the development of the land within [a water-quality-protection] zone," while at the same time ensuring the non-degradation of water quality within the zone via TNRCC oversight. TEX. WATER CODE § 26.179(d).

### B

The City contends that section 26.179 "delegates to private landowners the au-

thority to suspend enforcement of certain city ordinances and powers within the zones, effective immediately upon filing the zone designation." The City argues that section 26.179 improperly delegates the power to suspend laws to private landowners, in violation of article III, section 1 of the Texas Constitution, and separately argues that section 26.179 improperly allows private entities to suspend the laws in violation of article I, section 28's mandate that the power to suspend laws may be exercised only by the Legislature. *See* TEX. CONST. art. I, § 28 ("No power of suspending laws in this State shall be exercised except by the Legislature."). These arguments are interrelated and should be considered together.

To determine whether a delegation of the power to suspend laws has occurred, courts focus on the statutory language. *See Texas Boll Weevil Eradication Found., Inc. v. Lewellen,* 952 S.W.2d 454, 473–74 (Tex.1997). Section 26.179(d) allows landowners of a contiguous tract of land in excess of 1000 acres to designate the tract as a zone. *See* TEX. WATER CODE § 26.179(d). Owners of tracts containing fewer than 1000 acres but more than 500 acres may also designate a zone, but only with prior TNRCC approval. *See id.* A landowner may achieve "water-quality protection" within a zone by either (1) maintaining background levels of water quality in waterways or (2) capturing and retaining the first 1.5 inches of rainfall from developed areas. *See id.* § 26.179(a).

When designating a zone, the landowner must describe the zone by metes and bounds and include a general description of the proposed land uses within the zone (the land-use plan), a water-quality plan for the zone, and a general description of the water-quality facilities and infrastructure to be constructed for water-quality protection in the zone. *See id.* § 26.179(e). The water-quality plan must be signed and sealed by a registered professional engineer acknowledging that the plan is designed to achieve one of the two water-

quality protection standards of section 26.179 (capturing rainfall or maintaining background levels of water quality). *See id.* § 26.179(g). The water-quality plan must be submitted to the TNRCC for approval. *See id.* A city may not enforce in a zone any of its ordinances, land-use ordinances, rules, or requirements that are inconsistent with the land-use plan and the water-quality plan or that in any way limit, modify, or impair the ability to implement and operate the water-quality plan and the land-use plan within the zone as filed. *See id.* § 26.179(i). Thus, section 26.179 creates two regulatory schemes. In areas where no zone is designated, all applicable city regulations may be enforced. But where a zone is designated, section 26.179's state-regulated scheme applies and certain city regulations and powers are rendered inapplicable.

To begin with, the Legislature's allowing landowners to choose between alternative, legislatively established regulatory schemes is not a delegation. *See Helvering v. Lerner Stores Corp.,* 314 U.S. 463, 468, 62 S.Ct. 341, 86 L.Ed. 482 (1941) (holding that a statute allowing taxpayers to choose between alternative tax bases was not a delegation); *see also Thomas Cusack Co. v. City of Chicago,* 242 U.S. 526, 531, 37 S.Ct. 190, 61 L.Ed. 472 (1917) (declaring that a city ordinance allowing landowners to lift a zoning prohibition by majority consent "is not a delegation of legislative power, but is … a familiar provision affecting the enforcement of laws and ordinances").

Moreover, when a landowner chooses the state scheme by designating a zone and formulating water-quality and land-use plans, any city regulations inconsistent with those plans are rendered inapplicable by the terms of section 26.179(i), not by the landowners. Section 26.179(i) plainly states that:

> [a] municipality may not enforce in a zone any of its ordinances, land use ordinances, rules, or requirements … which are inconsistent with the land use plan

and the water quality plan or which in any way limit, modify, or impair the ability to implement and operate the water quality plan and the land use plan within the zone as filed; nor shall a municipality collect fees or assessments or exercise powers of eminent domain within a zone until the zone has been annexed for the municipality. A water quality protection zone may be annexed by a municipality only after the installation and completion of 90 percent of all facilities and infrastructure described in the water quality plan for the entire zone as being necessary to carry out such plan or the expiration of 20 years from the date of designation of the zone, whichever occurs first.

TEX. WATER CODE § 26.179(i). Thus, the Legislature itself suspended the City's authority—it mandated that certain municipal ordinances and powers are rendered inapplicable; it did not delegate the power to suspend laws. *See Harris v. Municipal Gas Co.,* 59 S.W.2d 355, 357 (Tex.Civ. App.—Fort Worth 1933, writ dism'd) (holding that a law suspending a municipal gas rate ordinance when a company filed a supersedeas bond that complied with Railroad Commission guidelines was not a delegation of the power to suspend laws); *see also McDonald v. State,* 615 S.W.2d 214, 219 (Tex.Crim.App.1981) (holding that the Legislature did not delegate the power to suspend laws to the Wildlife Commission when the Legislature, via statute, provided that certain laws regulating wildlife resources were suspended when the Commission issued a proclamation relating to those wildlife resources).

The Legislature determined which city regulations would be suspended, and did so in a manner narrowly tailored to section 26.179's purposes. The Legislature, via section 26.179(i), intended to and did suspend certain city regulations and powers (the power to annex, the power to collect fees and assessments, and the power to enforce any ordinances or regulations inconsistent with the water-quality and land-

use plans), consistent with section 26.179's stated purpose to facilitate development while maintaining water quality. Simply repealing section 26.177 or suspending all city regulations in the ETJ—which the Legislature could have done—would have been too broad to serve the Legislature's goal of removing only those city ordinances and powers that unduly hindered development. Section 26.177 is "subject to" section 26.179, and remains in full effect in all areas except where a zone is designated. *See* TEX. WATER CODE § 26.177(b). But even where a zone is designated, only city regulations and powers "inconsistent with" a landowner's plan are suspended. *See id.* § 26.179(i).

Although a landowner's plan is developed in accordance with section 26.179 and is subject to TNRCC review, the Legislature could not know which city ordinances and powers would conflict with a specific landowner's plan in a specific city, and thus could not specifically denote which ordinances and powers would be suspended. To further section 26.179's purpose, the Legislature chose to suspend only those city regulations inconsistent with a landowner's attempt to comply with the state scheme for water-quality regulation established in section 26.179, thereby allowing water-quality regulation and development under section 26.179 without undue interference from the city. Fostering development by achieving this balance is a sufficient state interest for the Legislature's suspension of these city regulations and powers, and is consistent with the Legislature's stated Water Code policy of maintaining water quality consistent with economic development. *See id.* § 26.003. As both the Court and the City concede, this legislation serves this state interest throughout Texas by limiting cities' regulatory powers throughout the State.

To support its argument that the landowner is entitled to suspend city laws, the City contends, and the Court agrees, that "a landowner is the sole arbiter of whether any City ordinance is 'inconsistent with' or

'may limit, modify or impair' his water quality plan." But these contentions are foreign to the actual language of the statute; section 26.179 does not in any way empower the landowners to determine which city regulations will not apply. Via section 26.179, the Legislature suspended those laws "inconsistent with" the landowner's water-quality and land-use plans, which must be formulated in compliance with section 26.179 and approved by the TNRCC. *Id.* § 26.179(i). Nowhere does the statute give landowners the authority to determine which ordinances are inconsistent with their plans. They are not given any license to themselves suspend any regulations. Nor are they even given any rights against the city if the city fails to comply with section 26.179(i) by enforcing regulations. Instead, if the city enforced other ordinances or regulations that a landowner believed to be inconsistent with its plans, the landowner would have to resort to the courts for relief, in which case the courts, not the landowners, would decide which city water-quality regulations were inconsistent with the plans. Thus, I would reject the City's arguments that section 26.179 violates article III, section 1 and article I, section 28 of the Texas Constitution because the statute does not delegate the power to suspend laws to the landowners.

### C

The City also argues, and the Court agrees, that section 26.179 impermissibly delegates legislative power in violation of article III, section 1 because it allows private landowners to set and enforce water-quality standards within the zones. To reach this conclusion, the City contends that section 26.179 delegates "no legislative authority at all" to the TNRCC. Similarly, the Court adopts an unnecessarily narrow interpretation of the TNRCC's regulatory and enforcement powers in the

zones. And, it is only by reading the statute so narrowly that the Court can conclude that a delegation has occurred.

To repeat, a landowner of a tract with fewer than 1000 acres and more than 500 acres may not even designate the tract as a zone without prior TNRCC approval. *See* TEX. WATER CODE § 26.179(d). But even for landowners with tracts exceeding 1000 acres (who may designate the tract as a zone without prior approval), section 26.179 provides that certain water-quality standards must be met. These standards place substantial limitations on a landowner's actions and are enforced by the TNRCC.

As noted, under section 26.179's state scheme, landowners may achieve water-quality protection either by capturing rainfall or by maintaining background levels of water quality. *Id.* § 26.179(a). Regardless of which option is chosen, the landowner must formulate a water-quality plan, which must be submitted to and approved by the TNRCC. *See id.* § 26.179(g). The TNRCC has the power to disapprove any plan if implementation of the plan will not reasonably attain one of the two defined water-quality-protection standards.[5] *See id.* Thus, the Legislature defined the water-quality-protection standards, and the TNRCC is the arbiter of whether a landowner has satisfied one of those standards.

If a landowner chooses to maintain background levels of water quality, section 26.179(b) imposes extensive monitoring requirements. The landowner must maintain background levels of water quality in waterways comparable to those levels that existed before new development. *See id.* § 26.179(b). Background levels are established by either (1) collecting data from one or more sites located within the zone or (2) if such data are unavailable, from calculations performed and certified by a registered professional engineer using cer-

---

**5.** In fact, the TNRCC denied approval of two water-quality plans filed by the landowners in this suit.

tain methods approved by the TNRCC until such data are available. *See id.* Background levels for undeveloped sites must be verified based on monitoring results from other areas of property within the zone prior to its development. *See id.* And, the determination of background levels of water quality must be signed and sealed by a registered professional engineer. *See id.* § 26.179(g). Each new phase of development requires monitoring for a three-year period, with a minimum of four samples taken per year at four different locations where runoff occurs. *See id.* § 26.179(b). Results of monitoring and a description of the best management practices being used in the zone must be summarized and submitted to the TNRCC each year during development, unless the TNRCC determines that monitoring is no longer required. *See id.* If performance monitoring and best management practices indicate that background levels were not maintained during the previous year, the landowner must (1) modify water-quality plans for future phases of development to the extent reasonably feasible and practical and (2) modify operational and maintenance practices in existing phases to the extent reasonably feasible and practical. *See id.* If a landowner chooses to retain the first 1.5 inches of rainfall, this water-quality monitoring is not required. *See id.*

Regardless of whether a landowner chooses to capture rainfall or to maintain background levels of water quality, section 26.179 provides that—in addition to section 26.179's requirements—the landowner is subject to a host of federal, state, and city regulations that govern the zone throughout its development and are enforceable by the TNRCC. For example, section 26.179(k) provides that development in a zone must comply with all state laws and TNRCC rules regulating water quality that are in effect on the date the zone is designated. *Id.* § 26.179(k). Thus, each phase of development in a zone must satisfy these requirements. Section 26.179(k) further provides that nothing in section 26.179 shall supersede or interfere with

the applicability of water-quality measures or regulations adopted by a conservation and reclamation district comprising more than two counties and that apply to the watershed area of a surface lake or surface reservoir that impounds at least 4000 acre-feet of water. *Id.* And, section 26.179(m) provides that the TNRCC may require and enforce additional water-quality-protection measures to comply with mandatory federal water-quality requirements, standards, permit provisions, or regulations. *Id.* § 26.179(m). Last, the city may still enforce any city ordinances and regulations that are not inconsistent with the land-use and water-quality plans. *See id.* § 26.179(i).

The TNRCC has authority to enforce these provisions under section 26.179(m) and under other provisions of Chapter 26 such as section 26.019, which expressly provides the TNRCC with authority "to issue orders and make determinations necessary to effectuate the purposes of [Chapter 26]." *See id.* § 26.019; *see also id.* § 26.0136 ("The [TNRCC] is the agency with primary responsibility for implementation of water-quality management functions, including enforcement actions, within the state."). In addition, other sections of the Water Code clearly establish that the TNRCC has "general jurisdiction over water and water rights" and the state's water-quality program, and that the TNRCC has the power to perform any acts "necessary and convenient to the exercise of its jurisdiction and powers as provided by [the Water Code] and other laws." *Id.* §§ 5.013(a), 5.102(a).

Thus, for landowners designating a zone, section 26.179 simply replaces city water-quality regulations established pursuant to section 26.177 with section 26.179's legislatively established standards—with TNRCC oversight. In addition to the city, state, and federal standards described in the preceding paragraphs, the landowners must develop a water-quality plan that will meet one of the two water-quality stan-

dards established by the Legislature. *See id.* § 26.179(g). Compliance with section 26.179's standards and additional state and TNRCC rules and regulations is monitored and enforced by the TNRCC. *See id.* § 26.179(g), (m).

As noted previously, once a water-quality plan is in effect, if a landowner has opted to maintain background levels of water quality but fails, he must modify existing operational and maintenance practices, modify his plan for future phases, and obtain TNRCC approval of the modified plan. *See id.* § 26.179(b), (g). The TNRCC need not approve a modified plan unless it finds the new plan will reasonably attain the water-quality protection standards of section 26.179. *See id.* § 26.179(g).

The Court also points to the fact that, if a landowner opts to capture the first 1.5 inches of rainfall, no water-quality monitoring is required. Simply because monitoring is not required does not mean that legislative authority has been delegated. The Legislature defined capturing 1.5 inches of rainfall as a water-quality-protection standard. If a landowner submits a plan to capture the first 1.5 inches of rainfall, which is sworn by a registered engineer and approved by the TNRCC, the landowner has complied with the standard created by the Legislature. The landowner is required to continue to capture rainfall throughout the project's development; the Legislature states that doing so will "achieve water-quality protection;" and the TNRCC can enforce this requirement. The simple lack of water-quality monitoring does not indicate that any legislative authority has been delegated to the landowners under this scheme.

The Court also incorrectly concludes that section 26.179(b) "prohibits the TNRCC from monitoring or requiring monitoring" in zones that are capturing rainfall. 22 S.W.3d at 883. The TNRCC requires landowners in such zones to maintain certain records and submit them with "an assessment of the water quality plan's success in meeting the TNRCC's water quality requirements." 30 Tex. Admin. Code § 216.8. As noted, the TNRCC has authority to enforce TNRCC regulations in effect at the time of the zone's designation, and may require landowners to submit records and reports indicating whether those requirements are satisfied. Although section 26.179(b) states that "[w]ater quality monitoring shall not be required in areas using the methodology described by Subsection (a)(2) [capturing rainfall]," a reasonable interpretation of that language, which comes at the end of the description of the water-quality monitoring required of zones electing to maintain background water quality, means that the water-quality monitoring described in section 26.179(b) is not applicable to such zones. It does not necessarily mean that no reporting or assessment of any type may be required to enforce other regulations. For example, if mandatory federal requirements required monitoring, certainly such monitoring could be required and enforced under section 26.179(m) despite section 26.179(b)'s apparently broad prohibition. Similarly, if state laws or TNRCC rules in effect at the time of the zone's designation require monitoring, such monitoring could be required and enforced by the TNRCC.

In sum, by enacting section 26.179, the Legislature established the two water-quality standards to be applied (capturing rainfall or maintaining background levels of water quality), and the methods by which landowners must comply with those standards. As the Court acknowledges, the statute provides specific standards and the specific means to comply with them. The only discretion given the landowners is in designing and implementing the land-use and water-quality plans to satisfy these standards. Section 26.179 does not delegate legislative power merely because the landowners may choose one of the two legislatively established methods and devise their own specific plans to meet the standards imposed. *See Perot v. Federal Election Comm'n*, 97 F.3d 553, 559–60

(D.C.Cir.1996) ("One might view [allowing organizations to decide what specific 'objective criteria' to use in holding a debate] as a 'delegation,' because the organization must use their discretion. . . . But in that respect, virtually any regulation of a private party could be described as a 'delegation' of authority, since the party must normally exercise some discretion in interpreting what actions it must take to comply."); *Whaley v. State*, 168 Ala. 152, 52 So. 941, 941 (1909) (holding that a streetcar company's right to make rules concerning transfers was not a delegation, because the right to make rules concerning transfers existed independently of the act, and the authority given was not the delegation of the authority to legislate). Otherwise, only complete governmental control and oversight would avoid an unconstitutional delegation. The Legislature should not be forced into the business of detailing the development plans for all parcels of land throughout the state; it is sufficient for the Legislature to establish a framework (through the TNRCC) to ensure that its standards are being satisfied.

This case differs significantly from *Boll Weevil*, in which we found that an unconstitutional delegation had occurred. *See Texas Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454 (Tex. 1997). In *Boll Weevil*, the foundation created by the statute was "little more than a posse" authorized to make decisions concerning other people's property without any supervision by a governmental agency. *Id.* at 486, 484–86 (Hecht, J., concurring in part and dissenting in part). The foundation represented the interests of growers who elected the board members, and the foundation was authorized to conduct referenda. The board then devised eradication guidelines and applied them to others' property. It could impose assessments and enter others' property to carry out its eradication programs, and could even require a cotton grower to destroy his crop. All of these powers were exercised without any meaningful review by a governmental agency. *See id.* Here,

there is no such representational system, landowners make decisions only with regard to their own property, and the decisions are subject to TNRCC review and approval both before and during implementation. Thus, in contrast to the situation in *Boll Weevil*, landowners designating a zone under section 26.179 control only their own property, are subject to legislatively defined standards and meaningful regulation, and are ultimately accountable to the TNRCC and the courts. Under such circumstances, I cannot conclude that any legislative power has been delegated to the landowners.

### D

Section 26.179 does not delegate legislative authority to private individuals or entities and does not violate article III, section 1 or article I, section 28 of the Texas Constitution. Because I would hold that no legislative power has been delegated to the landowners, I would not apply the second part of the *Boll Weevil* analysis (whether the delegation is appropriate). *See id.* at 471–72.

### III

### SPECIAL OR LOCAL LAW

The City also challenges section 26.179 as an unconstitutional local or special law. Article III, section 56 of the Texas Constitution provides:

**Local and special laws**

The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law

. . .

Regulating the affairs of counties, cities, towns, wards or school districts;

. . .

Exempting property from taxation;

. . .

And in all other cases where a general law can be made applicable, no local or special law shall be enacted....

Tex. Const. art. III, § 56.

Section 26.179 generally applies to the ETJ of a city with a population greater than five thousand. Tex. Water Code § 26.179(c), (d).[6] Section 26.179 applies when a municipality either: (1) enacted or attempted to enforce three or more ordinances or amendments attempting to regulate water quality or control or abate water pollution within the five years preceding the effective date of the Act (June 16, 1995), or (2) enacts or attempts to enforce three or more such ordinances or amendments in any five-year period. *Id.* § 26.179(c). The City of Austin maintains, without dispute from the landowners, that Austin is the only city that fell within section 26.179's classifications when it was passed by the Legislature, and that Austin is the only city that falls within these classifications today.

In *Maple Run v. Monaghan,* this Court recognized "the Legislature's broad authority to make classifications for legislative purposes." 931 S.W.2d 941, 945 (Tex. 1996) (citing *Miller v. El Paso County,* 136 Tex. 370, 150 S.W.2d 1000, 1001 (1941)). To determine whether a law that is limited to a particular class or locality is general or is an unconstitutional local or special law:

"[T]he classification ... must be based on characteristics legitimately distinguishing [the] class from others with respect to the public purpose sought to be accomplished by the proposed legislation." "The primary and ultimate test of whether a law is general or special is whether there is a reasonable basis for the classification made by the law, and whether the law operates equally on all within the class."

*Maple Run,* 931 S.W.2d at 945 (citations omitted). This test ensures that the classification is not "a mere arbitrary device resorted to for the purpose of giving what is, in fact, a local law the appearance of a general law." *Miller,* 150 S.W.2d at 1002.

The City argues that section 26.179 is an unconstitutional local or special law because it violates the underlying purpose of section 56, which is to prevent the granting of special privileges and the trading of votes for personal interests, *see Maple Run,* 931 S.W.2d at 945, and because it fails the test the Court has relied upon to foster that purpose. Specifically, the City argues that: (1) laws that define a class of one city are constitutional only if they advance a statewide interest, and section 26.179 does not; (2) section 26.179 is not broad enough to include a substantial class; (3) section 26.179's classification is not reasonably related to the statute's alleged purpose of ensuring regulatory certainty or providing the regulatory flexibility necessary to facilitate land development; (4) section 26.179's legislative history demonstrates it is unconstitutional; and (5) section 26.179's substantive provisions are not reasonably related to its alleged purpose.

In considering these arguments, it must be presumed that the Legislature has not acted arbitrarily or unreasonably. *See Smith v. Davis,* 426 S.W.2d 827, 831 (Tex. 1968). It is also presumed that the Legislature "understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds." *Id.* (quoting *Texas Nat'l Guard Armory Bd. v. McCraw,* 132 Tex. 613, 126 S.W.2d 627, 634 (1939)). A mere difference of opinion on the matter is not a sufficient basis for striking down legislation as arbitrary and unreasonable, because "[t]he wisdom or expediency of the law is the Legislature's prerogative, not ours." *Id.*

6. Section 26.179 does not apply to the ETJ of a city with more than 900,000 citizens that has passed an ordinance to prevent the pollu-tion of an aquifer that is the sole or principal drinking water source for that city. Tex. Water Code § 26.179(n).

## A

The City first argues that Texas has consistently applied a rule that statutes defining a class of one are constitutional only if they advance a statewide interest. To support this contention, the City cites *Maple Run*, 931 S.W.2d at 947; *County of Cameron v. Wilson*, 160 Tex. 25, 326 S.W.2d 162, 165–67 (1959); *Miller*, 150 S.W.2d at 1002–03; and *City of Irving v. Dallas/Fort Worth Int'l Airport Bd.*, 894 S.W.2d 456, 467 (Tex.App.—Fort Worth 1995, writ denied). But these cases fail to support its contention.

In *Maple Run*, this Court found no legitimate reason why the Legislature chose a classification confining the statute at issue to a single municipal utility district. *See Maple Run*, 931 S.W.2d at 946–47. The statute thus failed the traditional local and special law test. The statute's defenders argued that the otherwise unconstitutional statute should stand because it affected water conservation, a matter of statewide interest. *See id.* at 947. The City relies on the Court's response that "[w]hile we agree that all Texans have an interest in protecting this State's natural resources, we disagree that one may simplistically conclude that any law having a conservation purpose is ipso facto not a local or special law." *Id.* The City's reliance on this statement is misplaced for two reasons. First, the Court's statement was essentially that an otherwise unconstitutional statute cannot be saved merely by the fact that the statute affects a matter of statewide interest. That statement does not support the City's very different assertion that a statute *must* affect a matter of statewide interest to be constitutional. Second, *Maple Run* held that "the ultimate question under article III, section 56 is whether there is a *reasonable basis* for the Legislature's classification," and that the significance of the subject matter is merely a factor, albeit a substantial factor, in determining that reasonableness. *Id.*

Nor does *County of Cameron v. Wilson* support the City's proposed rule. The City asserts that the Court upheld the statute at issue in that case "because it concerned a matter of statewide importance." That assertion does not necessarily support a rule that a statute is unconstitutional *unless* it concerns a matter of statewide importance. Furthermore, this Court stated in *County of Cameron*—similar to its statement in *Maple Run*—that whether a statute deals with a general rather than local interest is "an important consideration," but "the primary and ultimate test is whether there is a reasonable basis for the classification and whether the law operates equally on all within the class." *County of Cameron*, 326 S.W.2d at 165.

*Miller v. El Paso County* also fails to support the rule that the City urges. The City contends that the Court in *Miller* struck down a statute because it limited its effect to one county. The case reveals that the Court struck down the statute not for that reason, but because "the attempted classification [was] unreasonable and [bore] no relation to the objects sought to be accomplished by the Act." *Miller*, 150 S.W.2d at 1003. Again the ultimate and dispositive inquiry was whether the classification was reasonably related to a purpose advanced by the statute.

Similarly, the City's reliance on *City of Irving* is misplaced. In that case, the court of appeals relied on the argument that a statute with an arbitrary classification can nonetheless be constitutional if it affects a matter of statewide importance. *See City of Irving*, 894 S.W.2d at 467. As stated above, that rationale does not necessarily support the rule that the City urges.

Most importantly, this Court rejected the City's argument in *Maple Run*, explaining that the ultimate question is whether there is a reasonable basis for the Legislature's classification and the significance of the statute's subject matter is merely an important factor in determining reasonableness. *See Maple Run*, 931 S.W.2d at 947.

Because there is no support for the City's contention that Texas courts have applied—much less "consistently applied"—a rule that one-member classes are appropriate only if they advance a statewide interest, I would reject the City's first argument and adhere to the rule recited in *Maple Run* that the ultimate inquiry is whether there is a reasonable basis for the classification; whether the statute advances a statewide interest is merely a factor in making that inquiry.

## B

In *Maple Run*, this Court quoted the fifty-eight-year-old proposition that "where a law ... affects only the inhabitants of a particular locality, 'the classification must be broad enough to include a substantial class and must be based on characteristics legitimately distinguishing such class from others with respect to the public purpose sought to be accomplished by the proposed legislation.'" *Maple Run*, 931 S.W.2d at 945 (quoting *Miller*, 150 S.W.2d at 1001–02). The City invokes part of this language in arguing that section 26.179's classification "is not 'broad enough to include a substantial class,' as required when a statute applies only to a 'particular locality.'" That argument could be understood to presuppose that the Court's language creates—apart from the usual requirement that a classification be reasonable—a discrete requirement that a statute be broad enough to include a substantial class.

That supposition would be misguided. In 1941, *Miller* first referred to a "substantial class." *See Miller*, 150 S.W.2d at 1001. In subsequent cases we have restated or quoted *Miller*'s statement of the law. *See, e.g., Maple Run*, 931 S.W.2d at 945; *County of Cameron*, 326 S.W.2d at 164; *Anderson v. Wood*, 137 Tex. 201, 152 S.W.2d 1084, 1087 (1941). Unfortunately, a selective reading of Texas courts' unusual [7] reference to a "broad" or "substantial class" could give a mistaken impression that article III, section 56 requires that legislation affect a certain minimum number of persons or entities.

But the greater expanse of this Court's local and special law jurisprudence reveals that an inquiry into the substantiality of a class cannot be divorced from the reasonableness of the lines drawn to form that class. Instead, the primary and ultimate inquiry is and has been the reasonableness of the lines a statute draws and whether the statute operates equally on all within the class. *See, e.g., Maple Run*, 931 S.W.2d at 945, 947; *County of Cameron*, 326 S.W.2d at 165; *Rodriguez v. Gonzales*, 148 Tex. 537, 227 S.W.2d 791, 793 (1950). Our cases demonstrate that a class is "substantial" not because it is big, but because it is delimited by reasonable distinctions that respond to real or substantial differences.

Before *Miller*, in *O'Brien v. Amerman*, 112 Tex. 254, 247 S.W. 270, 271 (1922), the Court referred to "substantial grounds for the classification." And two weeks before we decided *Miller*, we issued *Friedman v. American Surety Co.*, 137 Tex. 149, 151 S.W.2d 570, 577 (1941), in which we stated that "[c]lassifications must be based on a real and substantial difference, having relation to the subject of particular enactment. If there is a reasonable ground for the classification, and the law operates equally on all within the same class, it will be held valid." [8]

---

7. *State v. Town of Montclair*, 67 N.J.L. 426, 51 A. 494, 497 (1902) is one of the few cases beyond Texas that refers to a "substantial class."

8. In *Friedman*, the challenge was actually based on the Texas Constitution's equal rights provision, article I, section 3, rather than on article III, section 56. Nevertheless, "[t]he same considerations govern decisions whether a statute is challenged as special legislation or under the guaranty of equal protection" even though "[t]he close relation between these prohibitions ... has seldom been emphasized." 2 Singer, Sutherland Statutory Construction § 40.27 (5 th ed.1993); *see also Owens Corning v. Carter*, 997 S.W.2d 560, 583 (Tex.1999) (holding that a statute did not violate article III, section 56 for the same rea-

*Miller* itself makes clear that an inquiry into the substantiality of a class is ultimately part of an inquiry into the reasonableness of the classification. The portion of the opinion that first refers to a "substantial class" states that

legislation must be intended to apply uniformly to all who may come within the classification designated in the Act, and the classification must be broad enough to include a substantial class and must be based on characteristics legitimately distinguishing such class from others with respect to the public purpose sought to be accomplished by the proposed legislation. *In other words, there must be a substantial reason for the classification.*

*Miller,* 150 S.W.2d at 1001–02 (emphasis added).

And in *Maple Run,* the Court made this explicit by explaining that "the ultimate question under article III, section 56 is whether there is a *reasonable basis* for the Legislature's classification.... [T]he number of persons affected by the legislation are merely factors, albeit important ones, in determining reasonableness." *Maple Run,* 931 S.W.2d at 947 (emphasis in original).

### C

The City also argues that section 26.179's classifications are not reasonably related to the statute's alleged purposes of ensuring regulatory certainty or providing the regulatory flexibility necessary to foster land development. Section 26.179(c) provides the following classifications:

This section applies only to those areas within the extraterritorial jurisdiction, outside the corporate limits of a municipality with a population greater than 5,000, and in which the municipality either:

(1) has enacted or attempted to enforce three or more ordinances or amendments thereto attempting to

sons it did not violate the Equal Protection

regulate water quality or control or abate water pollution in the area within the five years preceding the effective date of this Act, whether or not such ordinances or amendments were legally effective upon the area; or

(2) enacts or attempts to enforce three or more ordinances or amendments thereto attempting to regulate water quality or control or abate water pollution in the area in any five-year period, whether or not such ordinances or amendments are legally effective upon the area.

TEX. WATER CODE § 26.179(c). The City challenges both section 26.179's three-ordinance demarcation and its population-based classification.

The stated purpose of section 26.179 is to "provide the flexibility necessary to develop the land [within the ETJ of certain municipalities] while ensuring the non-degradation of water quality within the area." SENATE COMM. ON NATURAL RESOURCES, BILL ANALYSIS, Tex. S.B. 1017, 74th Leg., R.S. (1995); HOUSE COMM. ON NATURAL RESOURCES, BILL ANALYSIS, Tex. S.B. 1017, 74th Leg., R.S. (1995); *see also* TEX. WATER CODE § 26.179(d). Legislative testimony and debate also suggest a related purpose of providing would-be developers with regulatory stability, certainty, or consistency and relief from "regulatory chaos." *See Hearing on Tex. H.B. 2471 Before House Comm. on Natural Resources,* 74th Leg., R.S. 1–2 (April 10, 1995) (statement of Rep. Lewis); *Hearing on Tex. S.B. 1017 Before Senate Comm. on Natural Resources,* 74th Leg., R.S. 2–3 (April 4, 1995); Debate on Tex. S.B. 1017 on the Floor of the Senate, 74th Leg., R.S. 1 (April 19, 1995). These are, of course, legitimate objectives for legislation.

The classification limiting section 26.179's application to cities that have enacted or attempted to enforce three or more ordinances or amendments regulating water quality within five years legiti-

Clause).

mately distinguishes between cities with respect to these objectives. This classification may not be perfectly tailored. It may not even be wise. But the Legislature was not arbitrary or unreasonable in deciding that enforcing or enacting three or more different municipal water-quality standards in a five-year period can interfere with "the flexibility necessary to develop the land" or result in the uncertainty section 26.179 was designed to combat.

The City argues that the classification is unreasonable because it is, in effect, overbroad: a city could fall within the classification for merely attempting to enforce three longstanding ordinances, for enacting ordinances not enforced against landowners, for enacting non-substantive water-quality ordinances, or for enacting ordinances that never become legally effective. I find some irony in the City's argument that a statute can be unconstitutionally local or special because its classification is too broad or general. Moreover, the City's interpretation of section 26.179's application is erroneously overbroad: to trigger section 26.179, the City must enforce or enact three different ordinances attempting to regulate water quality or control or abate water pollution—so that there are three different standards governing water quality—during a five-year period. The legislative history indicates that the Legislature was primarily concerned with a City's changing water-quality standards so that three or more different standards would apply during any five-year period. The Legislature believed that application of three or more different water-quality standards in a five-year period would lead to regulatory chaos that would in turn hinder development. Accordingly, consistent with this legislative intent, I would construe section 26.179 as applying when a City enacts or enforces three different water-quality ordinances within a five-year period.[9] Thus,

enforcing or enacting an ordinance triggers section 26.179 only insofar as applicable water-quality standards are changed. Accordingly, section 26.179 is not triggered simply by a City's enforcing three long-standing ordinances because standards are not changed. It is not arbitrary or unreasonable for the Legislature to determine that applying three or more water-quality standards in a five-year period could cause uncertainty that hampers a landowner's plans for development, whether or not the regulations are in the end applied to the landowner.

As noted, it is not necessary that the legislation advance a matter of statewide interest, but whether it does so is a significant factor in determining whether the Legislature's classifications are reasonable. In addition, the substantiality of the class (*i.e.*, the number of persons affected by the legislation) must be considered in evaluating the reasonableness of the classifications. Promoting development without unnecessary regulatory chaos is a matter of statewide interest. *See, e.g.*, TEX. WATER CODE § 26.003 ("It is the policy of this state ... to maintain the quality of water in the state consistent with ... the economic development of the state. . . ."). Although section 26.179 currently affects only the City of Austin, the City admits that section 26.179 creates an "open" class, which will include other cities who choose to enact additional water-quality ordinances. The City raises the possibility that other cities may hesitate to enact new water-quality ordinances in the future to avoid falling into this class. Rather than militating against section 26.179's reasonableness, this possibility demonstrates that section 26.179's classification reasonably advances the statute's purpose. Thus, I would hold that section's 26.179's three-ordinance classification is reasonable.

9. For example, when a City enforces one ordinance for two years and then enacts a new ordinance, it has applied two different standards, one enforced and one enacted. If the

City then enacts another ordinance two years later, it has applied three different standards within a five-year period, and section 26.179 is triggered.

I would also hold that section 26.179(c)'s population classification has a reasonable basis. When the Legislature passed section 26.179 in 1995, section 26.177 required only *cities with populations greater than five thousand* to establish water-pollution-control and abatement programs. *See* Act of May 29, 1971, 62d Leg., R.S., ch. 612, § 7, 1971 Tex. Gen. Laws 1974, 1980, *amended by* Act of May 5, 1997, 75ᵗʰ Leg., R.S., ch. 101, § 5, *1997 Tex. Gen. Laws 193, 197* (section 26.177 now provides that cities of 10,000 or more are required to establish a water-quality program if directed to do so by the TNRCC). These programs could include areas in the cities' ETJs. *See* Tex. Water Code § 26.177(b). It was not unreasonable for the Legislature to provide section 26.179's option only in the ETJs of the cities that section 26.177 required to implement water plans. Moreover, the five-thousand person population threshold distinguishes between small cities with half-mile ETJs and larger cities with ETJs ranging from one to five miles. *See* Tex. Loc. Gov't Code § 42.021(1)-(5). In a city with a population of fewer than five thousand inhabitants, the zone would necessarily be within one-half mile of the city's boundaries, while it may be up to five miles from a larger city's boundaries. The Legislature could have reasonably believed that it was necessary to exempt the state's smallest cities from section 26.179 because it would disproportionately affect their power to regulate water quality immediately adjacent to their boundaries.

### D

The City further argues that section 26.179's legislative history exposes it as an unconstitutional local and special law. To be sure, the legislative history reveals that FM Properties' experience in Austin's ETJ prompted at least some legislators to introduce and pass section 26.179. *See, e.g.,* Debate on Tex. S.B. 1017 on the Floor of the Senate, 74ᵗʰ Leg., R.S. 1–9 (April 19, 1995). And indeed, section 26.179's classification was intended to include Austin's

ETJ. Nevertheless, "a judiciary must judge by results, not by the varied factors which may have determined legislators' votes." *Daniel v. Family Sec. Life Ins. Co.,* 336 U.S. 220, 224, 69 S.Ct. 550, 93 L.Ed. 632 (1949).

As the City acknowledges, "[a]n improper legislative motive ... cannot taint an otherwise constitutional statute." *Cf. id.* at 224, 69 S.Ct. 550 ("[A court] cannot undertake a search for motive in testing constitutionality."). Moreover, even if some legislators intended the Act to apply to Austin's ETJ, the fact remains that the Act potentially subjects all Texas towns with a population of five thousand or greater to its application.

### E

Finally, the City argues that "[n]ot only is section 26.179's classification scheme unrelated to the purpose of avoiding regulatory chaos, but its practical application is likewise unrelated to this purpose." Apparently, the City is arguing that section 26.179's substance could not advance the purpose suggested, so the Court must look for another purpose as a basis for the classification. This assertion is wrong. For the would-be developer at least, forming a water-quality-protection zone will likely provide more regulatory certainty and "provide the flexibility necessary to develop the land" in areas previously subject to numerous changing standards because the landowner will be subject to only the standards detailed in section 26.179.

### IV

In addition to its argument that section 26.179 allows private landowners to suspend certain laws by designating a zone, the City contends that, even if the Legislature rather than the landowners suspended the City's regulations within the zones, that suspension is unconstitutional because it is local, not general. The Interpretive Commentary to article I, section 28 states that it prohibits "any person ..., except the Legislature, from setting aside the law," and even when the Legislature sus-

pends the law, "it must make the suspension general, and cannot suspend [the law] for individual cases or for particular localities." Tex. Const. art. I, § 28 interp. commentary (Vernon 1997). I would reject the City's argument that the suspension is local for the same reasons that I would hold that section 26.179 is not a local or special law.

## V

The City also argues that section 26.179 violates the Home Rule Amendment because its home-rule powers such as annexation may be curtailed only by the state's general laws. The City contends that section 26.179 is a local or special law that limits the City's annexation power, and, as such, it violates the Home Rule Amendment. Once again, because this argument is simply a reiteration of the City's allegation that section 26.179 is an unconstitutional local or special law, I would reject it on the same grounds.

## VI

Finally, the City argues that section 26.179 violates article I, section 16's prohibition against retroactive laws. *See* Tex. Const. art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."). A statute is retroactive if it takes away or impairs a party's vested rights acquired under existing law. *City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex.1997). The City alleges that section 26.179 retroactively impairs its vested rights because the City may no longer enforce water-quality and other ordinances or exercise its right of eminent domain within areas of its ETJ designated as zones.

First, the City makes no attempt to demonstrate how its authority to enforce water-quality, land-use, or other ordinances within its ETJ is a vested right. As noted, the City has such authority only because the Legislature chose to grant it in the first place. The City's continued authority to regulate in the ETJ is at all times subject to the will of the Legislature.

But even assuming that the City does in fact have a vested right affected by section 26.179, the City's argument fails. The City contends that section 26.179's retroactive impairment of its rights is unconstitutional because section 26.179 is a "special interest statute designed to assist private developers within the City's ETJ" and therefore the Legislature did not enact section 26.179 as part of a valid exercise of the police power to safeguard the public safety and welfare. This argument fails because section 26.179 is not a special law, but is a valid exercise of the police power to safeguard the public safety and welfare.

\* \* \* \* \*

In sum, because I disagree with the Court's conclusion that section 26.179 is an unconstitutional delegation and because I would hold that section 26.179 does not violate the other constitutional provisions asserted by the City, I respectfully dissent.